ROBERT C. SCHUBERT SBN 62684
WILLEM F. JONCKHEER SBN 178748
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

ROBERT I. HARWOOD
MATTHEW M. HOUSTON
BENJAMIN I. SACHS-MICHAELS
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
(212) 935-7400

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN OSWALD, Derivatively on Behalf of Nominal Defendant IDENTIV, INC., <br><br> Plaintiff, <br><br> v. <br><br> STEVEN HUMPHREYS, JASON HART, JAMES E. OUSLEY, GARY KREMEN, SAAD ALAZEM, DANIEL S. WENZEL, and BRIAN NELSON, <br><br> Defendants, <br><br> and <br><br> IDENTIV, INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Ryan Oswald, by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Identiv, Inc. ("Identiv" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and abuse of control.

### NATURE AND SUMMARY OF THE ACTION

1.     Identiv develops and manufactures physical access control, identity management, and radio frequency identification systems. The Company's products are used in corporate employee identification cards, company email, information technology networks, and facility access control, among other applications.

2.     In May 2015, Identiv disclosed that it would be unable to timely file with the U.S. Securities and Exchange Commission ("SEC") certain executive compensation information required to be disclosed in Part III of its Form 10-K for the 2014 fiscal year. This delay was due to the Company's having been served with a complaint from a former employee alleging, among other things, expense reimbursement improprieties with respect to certain executive officers and other employees. In response, the Board formed a Special Committee purportedly to investigate the allegations.

3.     Following disclosure of the Special Committee investigation, Identiv did not promptly file the missing executive compensation information and thereafter did not timely file its Forms 10-Q for the first and second quarters of 2015.

4.     On November 30, 2015, Identiv stunned investors when it disclosed that a week earlier its independent auditor, BDO USA, LLP ("BDO"), had resigned effective immediately. BDO stated it was "unwilling to be associated with the consolidated financial statements prepared by management for any of the fiscal periods within 2015." BDO's resignation related to the Special Committee's supposed investigation of the allegations of improper expense reimbursements to executives and others. BDO advised the Board that BDO disagreed with the scope and the remediation of the investigation. The Board, in response, ignored these concerns and determined the investigation was appropriate.

5. BDO informed the Board that Identiv suffered from two material weaknesses in the Company's internal controls, one of which stemmed directly from the sham Special Committee investigation. According to BDO, the conduct of the Special Committee investigation itself was evidence of an "entity level" material weakness of internal controls and that "'the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication and did not support an environment where accountability is valued.'"

6. To date, the results, if any, of the Special Committee investigation and the membership of the Special Committee have not been disclosed.

7. Plaintiff has not made a demand on the Board of Identiv because a majority of the Company's directors are complicit in the wrongdoing alleged herein. The Company's Board is currently comprised of six directors, two of whom are primarily employed by Identiv. Although the composition of the Special Committee has not been disclosed, it was comprised of one or more of Identiv's outside directors. These directors face a substantial likelihood of liability due, among other things, to their conduct as Special Committee members: the Special Committee's investigation was so improper as to itself constitute evidence of an entity-level material weakness to internal controls and caused the resignation of BDO. As a result, at least half of Identiv's Board is not disinterested and independent and/or faces a substantial likelihood of liability in connection with wrongdoing detailed herein.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. Plaintiff is a citizen of Texas and no defendant is a citizen of that state.

9. Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of Defendants resides in this District, the Company maintains its principal executive offices in this District, Defendants have

1    received substantial compensation in this district by engaging in activities that had an effect in

2    this district and are directly related to the wrongdoing alleged herein.

3                                            **PARTIES**

4        **A. Plaintiff**

5        10.    Plaintiff is a shareholder of Identiv, has been since prior to the events complained

6    of herein, and continues to be.

7        **B. Defendants**

8        11.    Nominal defendant Identiv is an entity incorporated under the laws of the State of

9    Delaware maintaining its principal executive offices at 2201 Walnut Avenue, Suite 310,

10   Fremont, California 94538.  Identiv is a security technology company providing various means

11   to establish identity in the government, education, retail, transportation, and healthcare sectors

12   worldwide.

13       12.    Defendant Steven Humphreys ("Humphreys") was appointed Chief Executive

14   Officer ("CEO") of Identiv in September 2015 and is a director.  Defendant Humphreys has been

15   a director of Identiv since 1996 and previously served as President and CEO from December

16   1996 to April 2000.  Upon information and belief, defendant Humphreys is a citizen of

17   California.

18       13.    Defendant Jason Hart ("Hart") has served as President of Identiv since September

19   2015 and is a director.  Previously, defendant Hart served as CEO of Identiv and a director

20   beginning in September 2013.  Defendant Hart joined Identiv in 2011 as an employee.  Upon

21   information and belief, defendant Hart is a citizen of California.

22       14.    Defendant James E. Ousley ("Ousley") is the current Chairman of the Board and

23   has served as a director of Identiv since July 2014.  At relevant times, defendant Ousley was the

24   Chair of the Audit Committee.  Upon information and belief, defendant Ousley is a citizen of

25   Arizona.

26       15.    Defendant Gary Kremen ("Kremen") has served as a director of Identiv since

27   February 2014.  Defendant Kremen is a member of the Audit Committee, the Compensation

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Committee, and the Nominating Committee.  Upon information and belief, defendant Kremen is a citizen of California.

16.     Defendant Saad Alazem ("Alazem") has served as director of Identiv since July 2013.  Defendant Alazem is a member of the Audit Committee and the Chair of the Compensation Committee.  Upon information and belief, defendant Alazem is a citizen of Maryland.

17.     Defendant Daniel S. Wenzel ("Wenzel") has served as a director of Identiv since 2010.  Defendant Wenzel is a member of the Compensation Committee and the Chair of the Nominating Committee.  Upon information and belief, defendant Wenzel is a citizen and resident of Switzerland.

18.     Defendant Brian Nelson ("Nelson") is currently Identiv's VP Business Strategy and previously served as the Company's Chief Financial Officer from December 2013 until November 2015 and has been employed by the Company since approximately 2011.  Upon information and belief, defendant Nelson is a citizen of California.

19.     The defendants named in ¶¶ 12 - 18 are sometimes referred to herein as the "Individual Defendants."

**DEFENDANTS' DUTIES**

20.     By reason of their positions as officers, directors, and/or fiduciaries of Identiv and because of their ability to control the business and corporate affairs of Identiv, at all relevant times defendants owed Identiv and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Identiv in a fair, just, honest, and equitable manner.  Defendants were required to act in furtherance of the best interests of Identiv and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Identiv and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

21.     Defendants, because of their positions of control and authority as directors and/or officers of Identiv, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Identiv, each of the defendants had knowledge of material non-public information regarding the Company

22.     To discharge their duties, the officers and directors of Identiv were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Identiv were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**SUBSTANTIVE ALLEGATIONS**

23.     Identiv operates in four segments: (i) "premises," offering management software and door readers; (ii) "identity," offering contact and contactless, portable and mobile smart card readers; (iii) "credentials," offering products used in a variety of identity-based applications such as electronic entertainment, loyalty schemes, and mobile payment; and (iv) the "all other" segment offering media readers.

24.     On March 23, 2015, defendants caused the Company to file with the SEC its Form 10-K for the year ended December 31, 2014.  This filing did not include the information required to be disclosed in Part III of the Form 10-K, including information relating to executive compensation, but stated the Company expected to file such information with the SEC in the near future.  The Form 10-K did not disclose that the Company was subject to any specific legal proceedings.  Filed as exhibits to the Form 10-K were certifications pursuant to the Sarbanes-Oxley Act signed by defendants Hart and Nelson.

25.     On April 17, 2015, defendants caused the Company to file a preliminary proxy statement in advance of the annual meeting of Identiv stockholders to be held on May 26, 2015. The preliminary proxy solicited stockholder votes to: (i) elect defendants Hart and Ousley to new three-year terms as directors; (ii) approve an amendment to the Company's certificate of incorporation to decrease the number of authorized common shares of Identiv from 130 million to 50 million; (iii) approve an amendment to the Company's 2011 compensation plan; (iv) ratify the appointment of the Company's independent auditor, BDA USA, LLP ("BDO") for the 2015 fiscal year; and (v) vote on a non-binding advisory resolution on the compensation of the Company's named executives.  The preliminary proxy did not mention the existence of any litigation against the Company or the existence of a special committee of the Board.  The preliminary proxy also disclosed in part:

> The Board of Directors has an active role, as a whole and also at the committee level, in overseeing management of the Company's risks. The Board of Directors regularly reviews information regarding the Company's credit, liquidity and operations, as well as the risks associated with each. The Compensation Committee is responsible for overseeing the management of risks relating to the Company's executive compensation plans and arrangements. The Audit Committee of the Board of Directors (the "Audit Committee") oversees management of financial risks. The Nominating Committee manages risks associated with the independence of the Board of Directors and potential conflicts of interest. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board of Directors is regularly informed through committee reports about such risks.

* * *

The Audit Committee of our Board of Directors, established in accordance with Section 3(a)(58)(A) of the Exchange Act, assists our Board of Directors in fulfilling its responsibility for oversight of the quality and integrity of our financial reporting processes, system of internal control, our process for monitoring compliance with laws and regulations, our audit process and standards of business conduct. Currently, the Audit Committee consists of Messrs. Alazem, Humphreys, Kremen and Ousley, and Mr. Ousley serves as Chairman. Previously, Dr. Liebler served as Chairman of the Audit Committee until the 2014 Annual Meeting when he completed his service as a director of the Company effective May 22, 2014 and was not nominated for re-election. Mr. Alazem is not standing for re-election at the Annual Meeting, but will continue to serve as a member of our Board of Directors, and as a member of the Audit Committee, until the expiration of his current term ending on the date of the Annual Meeting. The Audit Committee held six meetings during 2014.

26.     On May 1, 2015, defendants caused the Company to file with the SEC a Form 12b-25 with respect to its Form 10-K for the 2014 fiscal year.  The disclosure states:

The Company needs additional time to complete the information called for by Item III of Form 10-K, including the executive compensation information (the "Part III Information") which the Company was not able to complete by April 30, 2015 (the prescribed due date for the inclusion of the Part III Information in the Company's Annual Report filing) without unreasonable effort or expense due to the circumstances described below.

The Company has been served with a complaint (the "Complaint") from a former employee alleging, among other things, certain expense reimbursement issues with respect to certain executive officers and certain other employees of the Company. The Board of Directors of the Company has formed a special committee (the "Committee") to investigate the allegations contained in the Complaint and related matters with the assistance of independent counsel.

27.     On May 4, 2015, defendants caused the Company to file with the SEC a Form 8-K disclosing the same facts.  Undisclosed was the composition of the Special Committee.

28.     On May 13, 2015, defendants caused the Company to issue a press release announcing Identiv's first quarter 2015 results.  Among other things, the press release disclosed that the Company was reducing previously issued revenue guidance for 2015 from a range between $95 million and $105 million to a range between $90 million and $95 million.

29.     On May 15, 2015, defendants caused the Company to file with the SEC a Form 8-K attaching, "[u]naudited condensed consolidated financial statements and other information as of and for the three-month period ended March 31, 2015."

30.     On May 18, 2015, defendants caused the Company to file with the SEC a Form 12b-25 disclosing that it would be unable to timely file its Form 10-Q for the first quarter of 2015.  The filing states in part:

> The Company has been served with a complaint (the "Complaint") from a former employee alleging, among other things, certain expense reimbursement issues with respect to certain executive officers and certain other employees of the Company. The Board of Directors of the Company has formed a special committee (the "Committee") to investigate the allegations contained in the Complaint and related matters with the assistance of independent counsel. The investigation is ongoing and the Company does not plan to file an amendment to its Annual Report on Form 10-K to include the required Part III information or file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015 until it has additional information from such investigation. On May 15, 2015, the Company did file a Report on Form 8-K furnishing certain of the financial information that typically would be included in a Quarterly Report on Form 10-Q.

31.     On May 22, 2015, defendants caused the Company to issue a press release disclosing that Identiv had received from the Nasdaq Stock Market notice due to its failure to timely file the Form 10-Q for the first quarter of 2015, that the Company was not in compliance with Nasdaq Listing Rules and must submit a plan of compliance no later than July 20, 2015.

32.     On August 4, 2015, defendants caused the Company to issue a press release reporting preliminary second quarter 2015 results and updating full year 2015 guidance.  The press release disclosed that defendants were now forecasting substantially reduced 2015 revenues:

> The factors that affected the Company's results in the first half of 2015 are anticipated to persist through the duration of fiscal year 2015 and as a result, Identiv now expects revenues for the year to be between $65 million and $70 million, a decrease from the previous revenue guidance range of $90 million and $95 million. In response to these factors, Identiv has begun to implement cost reduction activities and expects to be adjusted EBITDA positive on a run rate basis in the fourth quarter of 2015, compared to previous expectations of achieving positive adjusted EBITDA for the full year 2015

33.     On August 14, 2015, defendants caused the Company to file with the SEC a From 12b-25 disclosing that it would be unable to timely file its Form 10-Q for the second quarter of 2015.  The filing states in part:

The Company has been served with a complaint (the "Complaint") from a former employee alleging, among other things, certain expense reimbursement issues with respect to certain executive officers and certain other employees of the Company. The Board of Directors of the Company has formed a special committee (the "Committee") to investigate the allegations contained in the Complaint and related matters with the assistance of independent counsel. The investigation is ongoing and the Company does not plan to file an amendment to its Annual Report on Form 10-K to include the required Part III information or file its quarterly reports on Form 10-Q for the quarters ended March 31, 2015 and June 30, 2015 until it has additional information from such investigation.

The Company is currently unable to predict when it will be in a position to file its Annual Report on Form 10-K/A to include the Part III Information and its quarterly reports on Form 10-Q for the quarters ended March 31, 2015 and June 30, 2015.

34.     On August 25, 2015, defendants caused the Company to issue a press release disclosing that Identiv had received from the Nasdaq Stock Market notice that due to its failure to timely file the Forms 10-Q for the first and second quarters of 2015, the Company was not in compliance with Nasdaq Listing Rules.  According to the press release, the Company submitted a plan to regain compliance that, if approved would could provide a listing exception of up to 180 calendar days.

35.     On September 16, 2015, defendants caused the Company to file with the SEC a Form 8-K disclosing that defendant Humphreys had been appointed CEO, replacing defendant Hart who continued to serve as President.  The Form 8-K disclosed that defendant Humphreys would continue to serve as a director but would no longer serve as the Chairman of the Board or on the Audit or Nominating Committees.

36.     On November 12, 2015, defendants caused the Company to issue a press release announcing Identiv's third quarter 2015 results.  The press release again reduced Identiv's 2015 revenue guidance: defendants were now forecasting revenue between $62 million and $64 million for the year.

37.     On November 19, 2015, defendants caused the Company to issue a press release disclosing that Identiv had received a determination letter from Nasdaq staff notifying it that its stock was subject to delisting.  The press release states in part:

FREMONT, Calif., November 19, 2015 — Identiv, Inc. (NASDAQ: INVE) today announced that, on November 17, 2015, the Company received a letter from the NASDAQ Listing Qualifications Staff (the "Staff") of The NASDAQ Stock Market LLC ("NASDAQ") notifying the Company that since it had not filed its Form 10-Q for the quarter ended September 30, 2015, and because it remains delinquent in filing the Company's Form 10-Q for the quarter ended June 30, 2015 and the Form 10-Q for the quarter ended March 31, 2015, the Staff has determined that the Company is non-compliant with the Nasdaq Listing Rule 5250(c)(1). As a result of the foregoing, the Company's common stock is subject to delisting unless the Company requests a hearing before the Nasdaq Hearings Panel (the "Panel") by November 24, 2015. The Company intends to timely request a hearing before the Panel at which it will present its plan to regain and thereafter maintain compliance with all applicable listing requirements.

In connection with its request for a hearing, the Company also intends to request a stay of the suspension of trading and delisting of the Company's common stock while the appeals process is pending. The Panel will notify the Company of its decision to allow the Company's common stock to continue to trade on The NASDAQ Capital Market pending the Panel's decision within 22 calendar days from the date of the Staff's letter.

There can be no assurance that the Panel will grant the Company's request for continued listing or stay the delisting of its common stock.

### **The Truth Begins to Emerge**

38.     On November 30, 2015, the Company filed with the SEC a Form 8-K disclosing that its independent auditor, BDO, "is unwilling to be associated with the consolidated financial statements prepared by management for any of the fiscal periods within 2015…"  The Form 8-K also disclosed in part:

On November 23, 2015, Identiv, Inc. (the "Company") received notice from BDO USA, LLP ("BDO") that BDO had resigned, effective immediately, as the Company's independent registered public accounting firm.

The reports of BDO and of Ernst & Young GmbH Wirtschaftspruefungsgesellschaft ("EY") on the Company's consolidated financial statements for the year ended December 31, 2014 and 2013, respectively, did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles except EY's report with respect to the fiscal year ended December 31, 2013, which indicated that there was substantial doubt as to the Company's ability to continue as a going concern.

BDO has advised the Board of Directors (the "Board") of the Company that BDO is unwilling to be associated with the consolidated financial statements prepared by management for any of the fiscal periods within 2015 and will not complete its

10

reviews of the interim financial information as of or for the periods ended March 31, 2015, June 30, 2015 or September 30, 2015, and additionally will not audit the Company's consolidated financial statements as of and for the year ending December 31, 2015 because of the disagreement described below in this Current Report on Form 8-K.

For the purposes of this Current Report on Form 8-K, the term "disagreement" is interpreted and used broadly, to include any difference of opinion concerning any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure which, if not resolved to the satisfaction of the independent registered public accountant, would have caused it to make reference to the subject matter of the disagreement in connection with its report.

During fiscal year 2015, the Board formed a Special Committee to investigate the allegations contained in a complaint. BDO advised the Board that BDO disagrees with the scope and the remediation of the special investigation that was undertaken by the Special Committee of the Board. The subject matter of the special investigation was first disclosed by the Company in a Form NTN 10-K filed with the Securities and Exchange Commission (the "SEC") on May 1, 2015 and a Current Report on Form 8-K filed with the SEC on May 4, 2015. The Board determined that the scope and the remediation of the special investigation were appropriate.

In addition, BDO has informed the Board of two material weaknesses in the Company's internal control over financial reporting. The first material weakness identified by BDO related to the Company's entity level controls, including a determination by BDO that "with respect to the results of the special investigation undertaken by the Special Committee during 2015, the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication and did not support an environment where accountability is valued."

The second material weakness identified by BDO related to revenue recognition; BDO determined that the Company has not designed and implemented appropriate controls to provide reasonable assurance that revenue transactions are adequately analyzed and reviewed to prevent or timely detect and correct misstatements. Specifically, during the course of conducting review procedures on the Company's interim financial information for the quarter ended June 30, 2015, BDO identified significant adjustments with respect to revenue transactions which resulted in the deferral of revenue; which errors were not identified by the Company's internal control over financial reporting. Those errors arose primarily as a result of the following matters:

- The Company did not appropriately consider the accounting for a revenue transaction totaling approximately $3.2 million, where the fact pattern suggested that the terms on the sales were not "fixed or determinable." This resulted in a correcting adjustment of revenue of $3.2 million.

- In a different revenue transaction, there were undelivered elements in the arrangement that were not adequately considered and assessed by the Company, resulting in a correcting adjustment of $0.6 million.

The first of these transactions related to a significant long-standing reseller, with which the Company was in discussions regarding delivery and payment schedules. The $3.2 million shipment was made and accepted in June 2015, and the Company provided 90 day "extended payment terms" specified by the customer during the quarter ended June 30, 2015. The Company originally recorded revenue during the quarter ended June 30, 2015 whereas the fact pattern indicated that the terms were not "fixed or determinable" at the time and revenue should have been recorded when the amount became due and payable by the customer. The account was fully paid in September 2015, and the revenue recognized upon payment during the quarter ended September 30, 2015.

The second transaction related to an agreement that BDO was made aware of during the quarter. The Company considered revenue recognition with respect to this transaction and prepared a memorandum that was provided to BDO. While the customer accepted delivery of the non-recurring engineering work in June 2015, BDO advised, and the Company agreed, that the Company, in its memorandum, had failed to conclude that there were undelivered software elements in the arrangement for which vendor specific objective evidence of fair value had not been established and accordingly, the Company recorded an adjustment in June 2015 to defer this revenue. The Company will recognize such revenue in the current quarter now that it is actively selling the solution it developed.

The quarterly results included in the Company's Current Report on Form 8-K filed August 13, 2015 reflected the adjustments described above.

While the full Audit Committee of the Board and BDO have not discussed the subject matter of the disagreement with BDO, the Audit Committee through its Chairman has had discussions with BDO concerning the subject matter of the disagreement. The Company has authorized BDO to respond fully to the inquiries of the Company's successor accountant, Burr Pilger Mayer Inc., concerning the subject matter of this Current Report on Form 8-K (this "Report").

39.     On December 24, 2015, defendants caused the Company to file a Form 8-K with the SEC disclosing that defendant Hart would not stand for reelection to the Board at the Company's annual meeting in February 2016.

40.     On January 8, 2016, the *UK Daily Mail* published an article titled "Tech worker claims she was fired for blowing the whistle on her CEO for expensing Vegas 'champagne shower' parties and his groundskeeper," which reported that a former employee of Identiv named

Ana Ruggiero, had sued defendant Hart and Identiv for age discrimination and for being wrongly fired.  According to Ms. Ruggiero's complaint, she was fired "in 'retaliation for her complaints about Hart's unlawful and fraudulent conduct in addition to age discrimination.'"  The article also reported in part:

> Ruggiero claims that Hart spent company money on personal expenses, wild parties in Las Vegas, dinners and gifts for a government official.
>
> In her lawsuit, she claims that Hart's personal expenses included five to six servers purchased on eBay for $18,000 each that 'were at his home' and never 'part of Identiv's information technology system,' NBC Bay Area reported.
>
> Ruggiero also said that Hart purchased $3,000 in American Express gift cards that were going to be designated for 'rewarding employees.'
>
> However, she alleges that the gift cards went to his groundskeeper because he 'owed him money.'
>
> 'The company didn't benefit from it. It was his lifestyle that was being funded,' Ruggiero told NBC Bay Area.
>
> Also in the lawsuit, Ruggiero claims that Hart had an improper relationship with a government official.
>
> Hart allegedly used Identiv money to pay for gifts and travel for 'a contact in the United States government believed to have been ... influential in assisting Identiv obtain certain government contracts worth millions of dollars,' according to NBC Bay Area.
>
> John Bailey, a former employee with the US Marshals Service under the Department of Justice, would frequent Identiv events, dinners and parties in Las Vegas, Ruggiero claims.
>
> 'Jason mentioned to me that Mr. Bailey was an influential person in purchasing, specifically the products that we sold,' Ruggiero told NBC Bay Area as she detailed a Fourth of July pool party in 2014 at Wet Republic in the MGM Grand Las Vegas.
>
> She provided documents that she claims Hart gave her to use for reimbursement of thousands of dollars from Identiv.
>
> NBC Bay Area reported from the records that Ruggiero provided that the bar bill was $8,700, 'including four magnum-sized bottles of vodka and champagne, plus 10 more bottles of bubbly for a poolside 'champagne shower.'

They also appeared to show that Bailey's airfare and itinerary were included in those documents.

* * *

Ruggiero also claims that Gary Kremen, who serves on the board of directors for Identiv and is also the founder of match.com partied with Hart and Bailey in Las Vegas during the Fourth of July 2014.

She claims that Kremen, who is also chairman of the Board of Directors for the Santa Clara Valley Water District, did not hold back while partying.

'In fact, Gary Kremen is the one who had the massages,' Ruggiero told NBC Bay Area.

In her lawsuit, she alleges that Kremen received $1,900 in massages alone and that she was instructed by Hart to submit the bill to Identiv for payment.

**DAMAGES TO THE COMPANY**

41.     As a direct and proximate result of the defendants' conduct, Identiv has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

(a)     loss of roughly 1/3 of the value Identiv stock since disclosure of BDO's resignation;

(b)     costs already incurred and to be incurred defending against the pending securities class action;

(c)     costs related to the inadequate Special Committee investigation, including committee fees paid to directors who were breaching their fiduciary duties;

(d)     increased borrowing costs due to the Company's failure to comply with credit agreements by filing timely financial statements;

(e)     any fines that are a result of the Company's violations federal and state law; and

(f)     incentive compensation paid to executives breaching their fiduciary duties.

42.     In addition, Identiv's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

43.     The actions complained of herein have irreparably damaged Identiv's corporate image and goodwill.  For at least the foreseeable future, Identiv will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Identiv's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

44.     Plaintiff brings this action derivatively in the right and for the benefit of Identiv to redress injuries suffered, and to be suffered, by Identiv as a direct result of breaches of fiduciary duty and abuse of control by the Individual Defendants.  Identiv is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

45.     Plaintiff will adequately and fairly represent the interests of Identiv in enforcing and prosecuting its rights.

46.     Plaintiff has continuously been a shareholder of Identiv at times relevant to the wrongdoing complained of and is a current Identiv shareholder.

47.     Identiv's current Board of Directors consists of the following six Director Defendants: Humphreys, Hart, Ousley, Kremen, Alazem, and Wenzel.  Plaintiff has not made any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below.

**Pre-Suit Demand is Excused as to Defendants Hart, Humphreys, and Kremen Because They are Not Disinterested and Independent**

48.     Defendant Humphreys is primarily employed as the CEO of Identiv.  In his role at Identiv, defendant Humphreys earns a base salary of $350,000, with a target annual performance bonus of $350,000.  His professional reputation and access to continued compensation from Identiv are completely reliant on the goodwill of his fellow directors who have the ability to replace him as CEO.  As a result, he is unable to disinterestedly and independently consider a demand for action against his fellow directors.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

49.     Defendant Hart is primarily employed as the President of Identiv.  In his role at Identiv, defendant Humphreys earns a base salary of $350,000, is eligible for sales commissions up to $350,000 and performance-based compensation up to $175,000, has use of a company car, and is reimbursed up to $10,000 annually for costs incurred with his personal use of a financial advisor.  Defendant Hart's professional reputation and access to continued compensation from Identiv are completely reliant on the goodwill of his fellow directors who have the ability to replace him as President.  As a result, he is unable to disinterestedly and independently consider a demand for action against his fellow directors.

50.     According to the *UK Daily Mail* article excerpt previously, defendant Kremen participated in the improper expenditure of Company funds and joined defendant Hart at a party or parties in Las Vegas during which defendant Hart was improperly using Company funds for personal expenses and to influence a government official.  In particular, Ms. Ruggiero alleges that defendant Kremen received "massages" costing $1,900 for which defendant Hart submitted a request for expense reimbursement to Identiv.  As a result, defendant Kremen is beholden to defendant Hart who participated with him in improper expenditure of Company funds and who is privy to the likely-embarrasing details of defendant Kremen's behavior in Las Vegas when he "did not hold back while partying." For these reasons, defendant Kremen could not disinterestedly and independently consider a demand for action against defendant Hart.

**Pre-Suit Demand Is Excused Because A Majority Of The Current Board Members Face A Substantial Risk Of Liability For Their Own Misconduct**

51.     Defendant Kremen faces a substantial likelihood of liability for beaches of fiduciary duties in connection with his behavior alleged herein.  This is because he participated in and observed the improper expenditure of company funds for lavish parties and to attempt to improperly influence a public official.  As a result, demand is excused as to defendant Kremen.

52.     Defendants Ousley, Alazem, Kremen, and Wenzel, one of them, or some combination of them were members of the Board Special Committee convened in April or May 2015 to investigate allegations from a former employee regarding improper expense reimbursement to executive officers.  When BDO resigned as Identiv's independent auditor on

November 23, 2015, it stated it was "unwilling to be associated" with Identiv's financial statements.  BDO resigned because it disagreed with the "the scope and the remediation of the special investigation undertaken by the Special Committee of the Board."  According to BDO, the problems with the Special Committee investigation were so serious that they rose to the level of a material weakness to Identiv's internal controls, leading BDO to determine that "'with respect to the results of the special investigation undertaken by the Special Committee during 2015, the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication *and did not support an environment where accountability is valued*.'"  (Emphasis added.)  As a result, the members of the Board's Special Committee face a substantial risk of liability due to their decision to conduct a sham investigation that was so clearly improper that it caused BDO, a major accounting firm likely earning millions of dollars in fees from its work for Identiv, to terminate its association with the Company mid-engagement.  Demand is therefore excused as to defendants Ousley, Alazem, Kremen, and Wenzel, one of them, or the combination of them that were members of the Board Special Committee.

53.    Demand is excused as to the entire Board.  All six members of Identiv's Board, defendants Humphreys, Hart, Ousley, Alazem, Kremen, and Wenzel, face a substantial likelihood of liability because they were complicit in the conduct of this sham investigation.  According to the Company's November 30, 2015 disclosure excerpted above, when presented with BDO's concerns about the Special Committee investigation, the Board "determined that the scope and the remediation of the special investigation were appropriate."  As a result, the entire Board was actively involved in the intentional creation of a material weakness to Identiv's internal controls, even knowing the objections of BDO.  Further, the entire Board presided over an additional material weakness to Identiv's controls that appears related to the allegations in the former employee's complaint: the Company has not designed and implemented appropriate controls to provide reasonable assurance that revenue transactions were adequately analyzed and reviewed to prevent or detect misstatements.  This failure is an additional breach of fiduciary duties.  Demand is therefore excused as to Identiv's entire Board.

54.     Defendants Ousley, Kremen, and Alazem are the members of the Audit Committee.  According to the Charter of the Audit Committee, the committee is responsible for:

(i) the Company's system of internal controls, (ii) the accounting, reporting and financial practices of the Company, including the integrity of the Company's financial statements, (iii) the Company's compliance with legal and regulatory requirements, and (iv) the independent auditor's qualifications, independence and performance.

The Charter further provides that the Audit Committee is responsible for "Overseeing the Company's compliance systems with respect to legal and regulatory requirements, and reviewing, approving and monitoring the Company's code of ethics for its senior financial officers."  As a result, defendants Ousley, Kremen, and Alazem were required to conduct inquiry and supervision into the Company's internal controls and such issues as the very subject matter of the Special Committee investigation.  The Audit Committee charter makes clear this function is not optional and the Committee was unambiguously required, at all relevant times, to conduct oversight.   However, the Audit Committee did not discharge its duties as required and consciously allowed the following two material weaknesses to Identiv's internal controls: (i) the sham Special Committee investigation; and (ii) the inability to accurately record and verify revenue transactions.  Defendants Ousley, Kremen, and Alazem breached their fiduciary duties by failing to discharge their responsibilities as members of the Audit Committee.  As a result, demand is excused as to defendants Ousley, Kremen, and Alazem because they face a substantial likelihood of liability for their role in the wrongdoing detailed herein.

55.     Plaintiff has not made any demand on the other shareholders of Identiv to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Identiv is a publicly held company with over 10.75 million shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I
## Breach of Fiduciary Duty

56.     Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

57.     Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Identiv's business and affairs, particularly with respect to issues so fundamental as proper accounting controls.

58.     Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Identiv.

59.     In breach of their fiduciary duties owed to Identiv, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

60.     In particular, the Individual Defendants knowingly or recklessly permitted the Company's internal controls to be materially weak and deficient, conducted the sham Special Committee investigation, and permitted improper accounting for revenue and improper expense reimbursement practices.

61.     The Individual Defendants, as directors of the Company, owed Identiv the highest duty of loyalty.  The Individual Defendants knowingly or recklessly breached their duty of loyalty by permitting the Company to fail in its legal compliance and reporting obligations and enter into a settlement which they knew or were reckless in not knowing was procured in violation of regulatory and legal requirements.

62.     As a direct and proximate result of defendants' breaches of their fiduciary obligations, Identiv has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II
### Abuse of Control

63. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

64. Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Identiv, for which they are legally responsible.

65. As a direct and proximate result of defendants' abuse of control, Identiv has sustained significant damages.

66. As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Identiv has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

67. By reason of the foregoing, Identiv has been damaged.

### PRAYER FOR RELIEF

FOR THESE REASONS, plaintiff demands judgment on behalf of Identiv as follows:

A. Declaring that plaintiff may maintain this action on behalf of Identiv and that plaintiff is an adequate representative of the Company;

B. Against all defendants, jointly and severally and in favor of Identiv for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duty and abuse of control;

C. Declaring that the defendants have breached and/or aided and abetted the breach of their fiduciary duties to Identiv;

D. Directing the defendants to take all necessary actions to reform and improve Identiv's corporate governance and internal procedures to comply with applicable laws and to protect Identiv and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1          1.      a proposal to strengthen the Company's disclosure and financial controls;

2          2.      a proposal to strengthen Board's supervision of operations and develop

3   and implement procedures for greater shareholder input into the policies and guidelines of the

4   Board;

5          3.      a provision to permit the shareholders of Identiv to nominate at least three

6   candidates for election to the Board; and

7          4.      a proposal to ensure the establishment of effective oversight of compliance

8   with applicable laws, rules, and regulations;

9      E.      Determining and awarding to Identiv exemplary damages, including

10  disgorgement of all profits, benefits, and other compensation obtained by defendants,  in an

11  amount necessary to punish defendants and to make an example of defendants to the community

12  according to proof at trial;

13     F.      Awarding Identiv restitution from defendants, and each of them;

14     G.      Awarding plaintiff the costs and disbursements of this action, including

15  reasonable attorneys' and experts' fees, costs, and expenses; and

16     H.      Granting such other and further equitable relief as this Court may deem just and

17  proper.

18                              **JURY DEMAND**

19     Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

20

21

22  Dated: January 14, 2016                    SCHUBERT JONCKHEER & KOLBE LLP

23

24                                             */s/Willem F. Jonckheer*
                                               ROBERT C. SCHUBERT
25                                             WILLEM F. JONCKHEER
                                               Three Embarcadero Center, Suite 1650
26                                             San Francisco, CA 94111
                                               (415) 788-4220
27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBERT I. HARWOOD
MATTHEW M. HOUSTON
BENJAMIN I. SACHS-MICHAELS
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
(212) 935-7400

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## IDENTIV, INC. VERIFICATION

I, Ryan Oswald, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 1-12-16

Ryan Oswald