IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN OSWALD, | No. C16-00241 CRB |
| Plaintiff, | **ORDER GRANTING MOTION TO DISMISS AND STAYING CASE** |
| v. | |
| STEVEN HUMPHREYS, JASON HART, JAMES OUSLEY, GARY KREMEN, SAAD ALAZEM, DANIEL S. WENZEL, and BRIAN NELSON, | |
| Defendants, | |
| and | |
| IDENTIV, INC., | |
| Nominal Defendant. | |

Ryan Oswald filed a derivative shareholder complaint on behalf of Identiv, alleging that the Identiv Defendants—Identiv's Board of Directors (Steven Humphreys, Jason Hart, James Ousley, Gary Kremen, Saad Alazem, and Daniel Wenzel) and one executive (Brian Nelson)—breached their fiduciary duties and committed corporate waste. See generally Compl. (dkt. 21). In their motion to dismiss, the Identiv Defendants maintain that Oswald fails to adequately allege that demand upon at least half of Identiv's Board of Directors would have been futile. See generally Mot. (dkt. 22). The Court agrees and therefore GRANTS the Identiv Defendants' motion to dismiss, without prejudice. Oswald fails to

sufficiently allege demand futility because he has yet to undercover essential information in the possession of Identiv. Under Delaware law, Oswald has the right to obtain Identiv books and records in order to better allege demand futility. Therefore, the Court ORDERS the case stayed so that Oswald can exercise his shareholder rights under Delaware law.

## I.      DISCUSSION

### A.      Demand Futility

Oswald brings a shareholder derivative complaint against the Identiv Defendants. "A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." Rosenbloom v. Pyott, 765 F.3d 1137, 1147 (9th Cir. 2014) (quoting In re Silicon Graphics, 183 F.3d 970, 989 (9th Cir. 1999)); see Fed. R. Civ. P. 23.1.

Oswald did not make a demand on the Identiv Board. Instead, he alleges that demand was excused because it would have been futile. Compl. ¶¶ 9–10. Federal Rule of Civil Procedure 23.1 requires a plaintiff to "state with particularity . . . the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1 (b)(3). Additionally, "[t]he substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief." Rosenbloom, 765 F.3d at 1148 (quoting Scalisi v. Fund Asset Mgmt., L.P., 380 F.3d 133, 138 (2d Cir. 2004)). Identiv is a Delaware corporation and therefore Delaware law applies.

To adequately allege demand futility under Delaware law, a shareholder plaintiff must create a reasonable doubt that either: "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Aronson v. Lewis, 473 A.2 805, 814 (Del. 1984). When the alleged misconduct is board inaction, the Rales test applies. See Rales v. Blasband, 634 A.2d 927, 933–34 (Del. 1993). Under the Rales test, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its

independent and disinterested business judgment in responding to a demand." Id. at 934.  To demonstrate that demand upon the Identiv board would have been futile, Oswald must therefore allege with particularity that at least three of the six Identiv Directors were not independent or disinterested.  See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1046 (Del. 2004).  Oswald has not done so.

In their briefing and at oral argument, the Identiv Defendants did not contest that Jason Hart was not independent or disinterested.[1]  See Mot. at 4–6; see Reply at 2–5 (dkt. 29); see Minutes at 6:21-25 (dkt. 33).  To meet the demand futility requirement, Oswald must therefore allege with particularity that at least two other Identiv Directors were not disinterested—yet he falls short.

Nevertheless, Oswald's allegations do suggest that some of the remaining five board members knew of and/or participated in Hart's misuse of Identiv funds at the time that it occurred.  Kremen and Humphreys, for instance, allegedly joined Hart on at least one Las Vegas trip for which Hart improperly sought reimbursement from Identiv.  Compl. ¶¶ 43, 45.  On one of the trips, Kremen allegedly received a $1,900 massage for which Hart submitted a request for expenses and reimbursement to Identiv.  Compl. ¶ 80.  The Las Vegas trips raise questions about the independence and disinterest of both Kremen and Humphreys.

In addition, it was not until oral argument that Oswald knew the composition of the Special Committee (Ousley and Wenzel), which Identiv tasked with investigating allegations that Hart misused Identiv funds.  According to Oswald, Identiv's auditor, BDO, resigned, stating that it was "unwilling to be associated" with Identiv's financial statements because it disagreed with the "scope and the remediation of the special investigation undertaken by the Special Committee of the Board."  Compl. ¶ 81.  Oswald alleges that BDO determined that "with respect to the results of the special investigation undertaken by the Special Committee during 2015, the Company's senior management leadership and operating style and the

---

[1] Even if the Identiv Defendants had not conceded this point, Oswald has sufficiently alleged that Hart was not disinterested.  Hart's alleged misconduct triggered the Special Committee's investigation and brought to light the deficiencies in Identiv's internal controls, and thus the first prong of the Aronson test is satisfied because Hart faced a substantial likelihood of liability resulting from the challenged transaction.  See Aronson, 473 A.2d at 814.

3

Board's oversight did not result in an open flow of information and communication and did not support an environment where accountability is valued." Compl. ¶ 81.[2]  However, the procedures, findings, conclusions, and recommendations of the Special Committee remain unknown.

Furthermore, Oswald alleges that the Compensation Committee—consisting of Alazem, Kremen, and Wenzel—was responsible for Hart's and Nelson's compensation. Compl. ¶ 82. Hart allegedly obtained a $26,000 loan from Nelson to pay an American Express bill. Compl. ¶ 44. Shortly thereafter, the Compensation Committee allegedly awarded Nelson 65,000 restricted stock units valued at $902,850. Compl. ¶ 44 n.12. In addition, after Hart's alleged wrongdoing became common knowledge among the other Identiv Directors, the Compensation Committee awarded Hart an unknown, although potentially substantial, amount of compensation. When Hart left Identiv, he received severance benefits. Compl. ¶ 85. Even though Hart allegedly reimbursed Identiv for approximately one-third of the funds that he allegedly diverted for personal use by submitting false expense reports, the details surrounding Hart's reimbursement remain unknown.[3] See Compl. ¶ 85. The Compensation Committee made the decisions about Hart's and Nelson's compensation and Hart's severance. It remains unclear which Identiv Directors decided to require Hart to return funds to Identiv or how they reached their decision. The context in which these decisions were made raises serious concerns as to whether the Identiv Directors exercised their business judgement in good faith.

In sum, Oswald's allegations—about Kremen's and Humphrey's involvement with Hart's misuse of Identiv funds, about Hart's and Nelson's compensation, and about BDO's resignation due to deficiencies with the Special Committee investigation—suggest that Identiv Board members in addition to Hart might not have been independent or disinterested.

---

[2] The Court notes that defense counsel tried at the motion hearing to minimize BDO's resignation, arguing that accounting firms quit all the time. See Minutes at 17:8-14.

[3] While Hart was required to divulge some of the funds he used for personal expenses, he also received a severance package and bonuses, see Compl. ¶¶ 51, 62, 67, 70, which could have been tailored to offset the amount he was required to divulge.

4

But without particularized facts as to at least two of the remaining Identiv Board members, Oswald has not satisfied the demand futility requirement of Rule 23.1. The information required to allege particularized facts is currently in Identiv's control. It is for these reasons, and not out of any love of fishing expeditions, that the Court GRANTS the Identiv Defendant's motion to dismiss, without prejudice, and ORDERS a stay so that Oswald can seek Identiv books and records under Delaware law.

### B. Production Under Delaware's Section 220

During oral argument, the Court asked the Identiv Defendants whether the Court should order disclosure of records and documents surrounding Hart's alleged improper reimbursements, the two Las Vegas trips, Hart and Nelson's compensation, the Special Committee investigation, and BDO's resignation. See Minutes at 21:25–22:4. The Identiv Defendants stated that Delaware law provided Oswald the means to obtain such information, but that he had forfeited his right to do so by filing his complaint with this Court. Not so.

8 Delaware Code section 220 (Section 220) "provides shareholders of Delaware corporations with a qualified right to inspect corporate books and records." Melzer v. CNET Networks, Inc., 934 A.2d 912, 916–17 (Del. Ch. 2007). The statute reads in relevant part:

> Any stockholder, in person or by attorney or other agent, shall upon written demand under oath stating the purpose thereof, have the right during the usual hours of business to inspect for any proper purpose, and to make copies and extracts from (1) the corporation's stock ledger, a list of its stockholders, and its other books and records . . . .

8 Del. Code § 220 (emphasis added). When an earlier filed complaint is dismissed without prejudice on demand futility-related grounds "it is a proper purpose under Section 220 to inspect books and records that would aid the plaintiff in pleading demand futility" in the plaintiff's "to-be-amended complaint." King v. Verifone Holdings, Inc., 12 A.3d 1140, 1150 (Del. 2011). According to Delaware law, therefore, Oswald has a proper purpose to inspect Identiv's books and records, and did not waive the right to do so by filing suit in this Court.

In Verifone, the Delaware Supreme Court rejected a bright line rule that would bar shareholder plaintiffs from seeking information pursuant to Section 220 after the dismissal of their shareholder derivative complaint. Id. at 1141. The plaintiff in Verifone had filed a

5

derivative shareholder complaint in the Northern District of California. Id. Judge Patel dismissed the complaint without prejudice for failing to properly allege demand futility, yet suggested that the plaintiff "engage in further investigation to assert additional particularized facts by filling a Section 220 action Delaware." Id. (quoting In re Verifone Holdings, Inc. Shareholder Deriv. Litig., No C 07-06347-MHP, 2009 WL 1458233, at *13 (N.D. Cal. May 26, 2009)). The parties were able to resolve most, but not all, of plaintiff's Section 220 request without resorting to litigation. Id. at 1144. But because the parties could not resolve some of the plaintiff's requests, the plaintiff filed a Section 220 action in Delaware. Id. The Delaware Supreme Court held that the Verifone shareholder plaintiff's Section 220 inspection of the corporation's "books and records to aid him in pleading demand futility in a to-be-amended derivative complaint" was a proper purpose under Section 220. Id. at 1150. Here, similarly, as this Court dismisses Oswald's complaint for failure to adequately plead demand futility, Oswald now has a proper purpose to seek Identiv books and records under Section 220.

As for the potential scope of what Oswald might obtain through Section 220, a "plaintiff can obtain books and records that address the crux of the shareholder's purpose . . . if that information is unavailable from another source." See Amalgamated Bank v. Yahoo! Inc., 132 A.3d 752, 788 (Del. Ch. 2016) (citing Wal-Mart Stores, Inc. v. Indiana Election Workers Pension Trust Fund IBEW, 95 A.3d 1264, 1271 (Del. 2014) (internal quotations omitted)). "The inspection should stop at the quantum of information that the [Delaware] court deems 'sufficient' to accomplish the plaintiff's stated purpose." Id. (citing Thomas & Betts Corp. v. Leviton Mfg. Co., Inc., 681 A.2d 1026, 1035 (Del. 1996)). In addition, a plaintiff needs to demonstrate, "by a preponderance of the evidence, a credible basis from which" a Delaware court can infer that a plaintiff's requested material meets a proper purpose. Seinfeld v. Verizon Commc'n, Inc., 909 A.2d 117, 123 (Del. 2006). Whether the documents requested meet a plaintiff's purpose "is fact specific and will necessarily depend on the context in which the shareholder's inspection demand arises." Amalgamated Bank, 132 A.3d at 788 (quoting Wal-Mart, 95 A.3d at 1283). A Section 220 inspection differs from

1  discovery in that the party seeking production bears the burden of demonstrating the
2  production's appropriate scope. Id. at 789. Overall, the inquiry is whether "the documents
3  are necessary and essential to satisfy the stockholder's proper purpose." Id. at 790 (quoting
4  Saito v. McKesson HBOC, Inc., 806 A.2d 113, 118 (Del. 2002)).

In Amalgamated Bank, the plaintiff's stated purpose was to investigate the hiring and firing of a Chief Operating Officer; the Delaware court held that the proper scope of production included the Chief Executive Officer's personal emails and other electronic documents. Id. at 792–93. Also within the proper scope of production were other books and records "beyond the Board-Level Materials," such as performance reviews. Id. at 795. In Wal-Mart, moreover, where a shareholder sought to investigate misconduct involving corporate officers, the court found that "officer level documents" were "necessary and essential" to determine whether misconduct occurred, and that officer-level documents were appropriate to establish director knowledge of the misconduct. 95 A.3d at 1273; see also Amalgamated, 132 A.3d at 791–92.

Here, there are three categories of books and records that would facilitate this Court's demand futility analysis:

1. All books and records determining the extent of director knowledge of or participation in Hart's allegedly improper reimbursements, especially those involving the Las Vegas trip(s) in which Kremen and Humpreys allegedly participated.

2. All books and records establishing how the Special Committee was formed, as well as the Special Committee's composition, procedures, findings, conclusions, and recommendations. This would include any books and records relevant to BDO's resignation.

4. All books and records regarding Hart's compensation and severance, Nelson's compensation, and Hart's reimbursements to Identiv.

//

## II. CONCLUSION

For the foregoing reasons, the Court GRANTS the Identiv Defendants' motion to dismiss, without prejudice. In addition, the Court STAYS the case so that Oswald can exercise his rights under Section 220 to inspect Identiv's books and records.

**IT IS SO ORDERED.**

Dated: November 7, 2016

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE