IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RYAN OSWALD,

          Plaintiff,

    v.

IDENTIV, INC., et al.,

          Defendants.

Case No. 16-cv-00241-CRB

**ORDER DENYING MOTION TO DISMISS**

      Ryan Oswald brings this shareholder derivative lawsuit on behalf of Identiv, Inc., claiming that Defendants, Identiv's Board of Directors and an executive,[1] breached their fiduciary duties and committed waste. See generally Second Amended Complaint ("SAC") (dkt. 38-3). Before Oswald can proceed on behalf of Identiv, he must plead particularized facts demonstrating that a demand upon the Identiv Directors would have been futile. This Court previously granted without prejudice Defendants' Motion to Dismiss Oswald's Amended Complaint for failure to adequately allege demand futility, and stayed the case to allow Oswald to investigate further and amend his complaint. Order (dkt. 34). Oswald has now amended, and Defendants again move to dismiss. See SAC; MTD (dkt. 43). As discussed below, Oswald's Second Amended Complaint includes new

---

[1] Identiv is the nominal defendant in a derivative capacity. The defendants in this action are: current Identiv directors Steven Humphreys, Gary Kremen, and James E. Ousley; former directors Jason Hart, Saad Alazem, and Daniel S. Wenzel; and Identiv's former Chief Financial Officer, Brian Nelson.

particularized facts sufficient to show demand futility. The Court therefore DENIES the Motion to Dismiss.

## I.    BACKGROUND

Identiv is a security technology company incorporated under the laws of the State of Delaware. SAC ¶ 16. Jason Hart was its CEO, and Ana Ruggiero was Hart's executive assistant until she was fired. See id. ¶¶ 18, 44–51. In April 2015, Ruggiero brought suit in Alameda Superior Court alleging a number of employment-related causes of action. Id.; see also Ruggiero v. Identiv, Inc., No. HG15764795 (Cal. Super. Ct. Alameda County., filed Apr. 2, 2015). In her complaint, Ruggiero alleged that Hart had improperly charged Identiv for numerous personal expenses. SAC ¶¶ 45–50.

About a month after Ruggiero filed her complaint, Identiv disclosed that it would be unable to timely file certain executive compensation information with the U.S. Securities and Exchange Commission (SEC). Id. ¶ 2. Identiv's Board of Directors— then composed of Humphreys, Hart, Ousley, Kremen, Alazem, and Wenzel—formed a Special Committee to investigate the allegations in Ruggiero's lawsuit and any similar or related facts. Id. ¶¶ 53, 96. In November 2015, Identiv publicly disclosed that its independent auditor, BDO, had resigned because it was "unwilling to be associated with the consolidated financial statements prepared by management for any of the fiscal periods within 2015." Id. ¶ 4.

Oswald then brought this shareholder derivative lawsuit against Identiv's Board of Directors, alleging that the Identiv Directors breached their fiduciary duty and wasted

corporate assets.[2]  See Complaint (dkt. 1); FAC (dkt. 21).  In November 2016, this Court granted without prejudice Defendants' Motion to Dismiss Oswald's Amended Complaint for failure to allege demand futility with particularity, and stayed the case "so that Oswald can exercise his rights under [Delaware law] to inspect Identiv's books and records." Order at 8.  Oswald's Second Amended Complaint includes new facts and details obtained through this inspection.

Oswald's Second Amended Complaint alleges that the Board allowed Hart to systematically misuse and misappropriate Identiv's funds for his own personal indulgence. Oswald alleges that Hart spent tens of thousands of dollars on two parties in Las Vegas, then submitted the charges to Identiv for reimbursement.[3]  SAC ¶¶ 48, 50.  Board members Kremen and Humphreys attended these parties.  Id.  One party in early July 2014 included $8,700 in "champagne showers,"[4] $1,900 in massages for Kremen, $5,000 in vodka, and $5,000 at a restaurant.  Id. ¶ 48.  In September 2014, Hart, Nelson, Humphreys, Kremen, and five other people spent $28,959 in Las Vegas, including $14,500 at a nightclub and $8,000 on upgraded hotel accommodations.  Id. ¶ 50.  Oswald alleges that Hart routinely submitted business expense reimbursement requests for other non-business purchases, including two drones, for approximately $5,000, six computer servers for his home, for $18,000 each, and $3,000 in American Express gift cards.  Id. ¶ 46.

---

[2]  This Court also handled the related securities class action, which involved the same facts as those in Oswald's original Complaint.  See generally Rok v. Identiv, No. 15-cv-5775 CRB, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017).  The Court dismissed the securities case, observing that the "allegations might support a derivative shareholder suit, . . . but they do not provide the necessary scienter in a securities fraud case."  Id., 2017 WL 35496, at *13.
[3]  The documents Identiv produced in response to Oswald's books and records demand corroborate these expenses, originally described in the Ruggiero Complaint.  See id. ¶ 56.
[4]  A champagne shower involves shaking a champagne bottle in celebration and spraying it on oneself and one's friends.  See, e.g., https://www.youtube.com/watch?v=Dj-O9Dr1kSA.

Oswald further alleges that, as detailed in the Ruggiero Complaint, Ruggiero raised her concerns about Hart's charges with the CFO, defendant Nelson, but Nelson took no action. Id. ¶ 48. In addition, Nelson gave Hart a personal loan of $26,000, after which the Compensation Committee "suddenly" awarded Nelson equity compensation worth $902,850. Id. ¶ 49. Identiv's public filings and Board materials corroborate the timing and amount of this award. Id. ¶ 49 n.2. Oswald alleges that Hart orchestrated the award as repayment for the loan and "in exchange for [Nelson's] silence" about Hart's misuse of corporate funds. Id. ¶ 6.

In May 2015, the Board established a Special Committee, composed of Board members Ousley and Wenzel, in response to the allegations in the Ruggiero Complaint. Id. ¶ 53. The Special Committee was to "consider, investigate, review, evaluate and analyze the facts, allegations and circumstances" of the Ruggiero Complaint, and "any similar or related facts . . . relating to expense reimbursements or payments on behalf of executive officers of the company." Id.; McGrath Decl. (dkt. 43-1), Ex. 15. The Special Committee was not empowered to make a final decision regarding its investigation or take any final action, only to "report its findings to the full Board and . . . recommend to the full Board what action to take, if any, in response to its findings." SAC ¶ 53. The Special Committee retained independent counsel[5] and the accounting firm, Deloitte, to assist in its investigation. Id. ¶¶ 54, 56.

Deloitte reviewed 1,987 expense reimbursement submissions, totaling

---

[5] The source for this allegation, the BDO resignation letter discussed below, defines independent counsel as the "independent law firm" retained by the Special Committee together with a "forensic consultant hired by the law firm." See id. ¶ 78.

4

$1,011,185.02.[6]  See id. ¶ 62; McGrath Decl. Ex. 17 ("Deloitte Spreadsheet").[7]  Deloitte

raised concerns about charges from one of the Las Vegas parties attended by defendants

Hart, Kremen, and a "U.S. Marshals Contact," John Bailey, repeatedly flagging the trip in

its report as involving "potential bribery issues."  SAC ¶¶ 57, 58.  Bailey was a federal

employee "believed to have been subsequently influential in assisting Identiv obtain

certain government contracts worth millions of dollars."  Id. ¶ 48.  According to the

Ruggiero Complaint, Hart initially labelled the expenses as "customer event – senior exec

and Board plus customers including us marshall [sic]."  Id.  In the course of the Special

Committee's investigation, Hart reclassified the charges for Bailey's lodging as "100%

personal," but maintained that his own lodging for the trip was "100% business."  Id. ¶ 58.

Deloitte noted the inconsistency in its review: "How can Jason Hart's lodging be 100%

business when Mr. Bailey's lodging is listed as 100% personal.  Either Mr. Hart took Mr.

Bailey to Las Vegas as a personal friend with no business intent or he took Mr. Bailey to

Las Vegas with a business intent."  Id.

Deloitte identified many other red flags in addition to the bribery issue.  In the

Deloitte Report, it repeatedly observed that billing many of the challenged charges as

business expenses might "not be acceptable for IRS purposes."  Id. ¶ 59.  In connection

with a $14,500 dinner in Las Vegas at which defendants Hart and Kremen were present,

Deloitte wrote: "This is not a 'closing celebration dinner.'"  Id. ¶ 60.  Regarding the same

trip to Las Vegas, Deloitte noted, "[t]o assist the Board of Directors in carrying out its

---

[6]  Identiv produced the Deloitte Report to Oswald in response to his books and records demand.
See Opp'n (dkt. 44-2) at 2 n.4.
[7]  The Court requested and reviewed an electronic searchable version of the Deloitte Spreadsheet.
See Order Directing Filing (dkt. 50).

fiduciary duties, Deloitte is prepared to provide the Board in excess of 1,000 pictures documenting this trip." <u>Id.</u> Deloitte also flagged multiple expenses with the note, "Deloitte believes that the lack of support [for the charge] represents a business and potentially a tax issue," and "Identiv should consult its tax attorneys on these matters." <u>See, e.g.</u>, Deloitte Spreadsheet, ID# 1591, 1715 at Column L.

According to Identiv's books and records production to Oswald, Deloitte discussed these issues with the independent counsel and the Board. SAC ¶¶ 57, 59. In its report, Deloitte stated that the reasons Hart gave for expenses associated with the Las Vegas parties (and many other expenses) were not sufficient to support a business purpose. <u>Id.</u> The Board "[noted] Deloitte's position," then made a "policy decision" to allocate the challenged charges, in whole or in part, as business expenses anyway. <u>Id.</u> The Board decided to treat the expenses associated with the U.S. Marshal contact, Mr. Bailey, as personal expenses. <u>Id.</u>

Deloitte concluded that $518,601.36 of the charges it reviewed were non-business personal expenses, expenses that violated Company policy and could not be supported as business expenses, or possible business expenses that were incurred in violation of Company policy. <u>See id.</u> ¶ 62. The Board approved classification of an additional $257,260.85 in expenses as business expenses, in many instances overriding Deloitte's conclusion that the purpose provided was <u>not</u> sufficient to support a business purpose. <u>See id.</u>; <u>compare</u> Deloitte Spreadsheet column Q ("no") <u>with</u> <u>id.</u> column S (amount approved by Board as business expense).

Oswald alleges that independent counsel asked the Special Committee to allow further investigation. <u>See</u> SAC ¶ 78 ("multiple requests by . . . the Independent Counsel. .

. . Independent Counsel has communicated various other limitations in the scope of the Independent Investigation, including that the Independent Investigation was halted before Independent Counsel completed its planned investigative procedures. . . . limited advice provided by Independent Counsel"); id. ¶ 99 ("Special Committee's counsel believed that additional investigation should be conducted"); id. ¶ 102 (same).

There was no further investigation. On August 28, 2015, the Special Committee reported its findings and presented recommendations to the Board.[8] Id. ¶ 70. Hart was not present. Id. The Special Committee members, Ousley and Wenzel, expressed their view that the investigation "had been very extensive and thorough," but "noted input from independent counsel to the Committee with respect to possible additional investigative work on certain items." Id. ¶ 71. The non-committee board members present—Humphreys, Kremen, and Alazem—"unanimously accepted the recommendation of the [Special] Committee" to conclude the investigative phase of the Special Committee. Id.

Identiv's independent auditor, BDO, requested on multiple occasions that the Board investigate further, and resigned on November 23, 2015, essentially because the Board refused. Id. ¶ 78. BDO's resignation letter[9] to the Board states that after it became aware of Hart's "improper expenses, including relating to the entertainment of an employee of the US Marshals Service," "in accordance with the requirements of Section l0A [of the Securities Exchange Act of 1934,] . . . BDO has sought to determine whether it is likely that an illegal act has occurred; and if so, the possible effect of each illegal act on the

---

[8] Identiv produced the Special Committee Report to Oswald in response to his books and records demand. See Opp'n at 2 n.5.
[9] Identiv produced the BDO letter to Oswald in response to his books and records demand. See Opp'n at 3 n.6.

financial statements of the Company." Id. Despite "multiple requests by BDO," the

Special Committee refused to seek any legal advice from independent counsel regarding

whether an illegal act had occurred, and halted the investigation "before Independent

Counsel completed its planned investigative procedures." Id. BDO determined that "the

Company ha[d] not taken timely and appropriate remedial actions because of, at a

minimum, the limitations on the scope of the Independent Investigation, the limited advice

provided by Independent Counsel, and the limited actions taken regarding the on-going

role and involvement of Mr. Hart with the Company." Id. BDO advised that it was

"unwilling to be associated with the consolidated financial statements prepared by

management for the quarterly and annual financial reporting periods for the fiscal year

ending December 31, 2015," and resigned effective immediately. Id.

In addition to the allegations concerning Identiv's investigation of the claims in the

Ruggiero Complaint, Oswald also alleges that the Board gave Hart a golden parachute. In

September 2015, Humphreys replaced Hart as the CEO of Identiv, but—despite the

Special Committee's conclusion that "Mr. Hart's entertainment of a U.S. government

employee in 2014 violated the Company's Code of Conduct and Ethics," id. ¶ 70—Hart

continued to serve as President, id. ¶ 74. Identiv entered into a new compensation

agreement with Hart, worth up to $875,000 per year, including commissions and bonuses,

plus valuable non-cash benefits. Id. After this action was filed, Hart resigned for reasons

purportedly unrelated to the wrongdoing. Id. ¶ 86. Because Hart was not fired for cause,

he received full severance. Id. ¶¶ 86, 107. Although Identiv's amended Form 10-K for the

year 2014 indicates that Hart was improperly reimbursed for $111,015 in non-business

expenses, he only repaid $35,784 upon leaving Identiv. Id. ¶¶ 81, 89. Oswald alleges that

8

the true amount of company funds that Hart diverted is significantly higher than the

$111,015 that Defendants admit to in Identiv's 10-K filings.  <u>Id.</u> ¶ 8.

Since this action was filed, Hart, Alazem, and Wenzel left the Board, and non-

defendant director Nina B. Shapiro joined it.  SAC ¶ 96.  The current Board is Humphreys,

Kremen, Ousley, and Shapiro.  <u>Id.</u>

## II.     LEGAL STANDARD

"The derivative form of action permits an individual shareholder to bring suit to

enforce a corporate cause of action against officers, directors, and third parties."

<u>Rosenbloom v. Pyott</u>, 765 F.3d 1137, 1147 (9th Cir. 2014) (quoting <u>Kamen v. Kemper Fin.</u>

<u>Servs., Inc.</u>, 500 U.S. 90, 95 (1991)).  "A shareholder seeking to vindicate the interests of a

corporation through a derivative suit must first demand action from the corporation's

directors or plead with particularity the reasons why such demand would have been futile."

<u>Id.</u> at 1148 (citing Fed. R. Civ. P. 23.1).  "The purpose of this demand requirement in a

derivative suit is to implement 'the basic principle of corporate governance that the

decisions of a corporation—including the decision to initiate litigation—should be made

by the board of directors or the majority of shareholders.'"  <u>Id.</u> (quoting <u>In re Pfizer Inc.</u>

<u>S'holder Derivative Litig.</u>, 722 F. Supp. 2d 453, 458 (S.D.N.Y. 2010)).

Rule 23.1 requires a plaintiff to "allege with particularity . . . the reasons for the

plaintiff's failure to" make a demand.  Fed. R. Civ. P. 23.1(b)(3).  However, "[t]he

substantive law which determines whether demand is, in fact, futile is provided by the state

of incorporation of the entity on whose behalf the plaintiff is seeking relief."  <u>Rosenbloom</u>,

765 F.3d at 1148 (citation omitted).  Identiv is a Delaware corporation and Delaware law

therefore applies.

In the context of pre-suit demand, the directors of a corporation enjoy the benefit of the business judgment rule, which "is a presumption that in making a business decision, the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984). Demand is excused as futile where the plaintiff creates a reasonable doubt that the directors' action was entitled to the protections of the business judgment rule. Id. at 808. "Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." Rosenbloom, 765 F.3d at 1148 (quoting Brehm v. Eisner, 746 A.2d 244, 255 (Del. 2000)).

## III.    DISCUSSION

Defendants move to dismiss Oswald's Second Amended Complaint on the grounds that (A) Oswald lacks standing because some of the alleged wrongdoing occurred before he was an Identiv shareholder, and (B) Oswald has not alleged particularized facts to demonstrate demand futility. As discussed below, both of Defendants' arguments fail.

### A.    Standing

A derivative plaintiff has no standing to sue unless he meets Rule 23.1's requirements, Kona Enters., Inc. v. Estate of Bishop, 179 F.3d 767, 769 (9th Cir. 1999), and Rule 23.1 requires that a derivative plaintiff be a shareholder at the time of the alleged wrongful acts, Fed. R. Civ. P. 23.1(b)(1). Defendants argue that Oswald does not have standing to bring derivative shareholder claims because some of the alleged misconduct occurred before he became a shareholder. MTD at 2.

Oswald has been a shareholder of Identiv since September 24, 2014. SAC ¶ 15. He

therefore has standing to bring claims for alleged breaches of fiduciary duty or waste that occurred after September 24, 2014, but not before. See Kona, F.3d at 769. To the extent that Defendants allowed Hart to misuse corporate funds prior to September 2014, Oswald does not have standing to challenge this conduct.[4] However, even conduct that occurred before an individual was a shareholder may be relevant to the extent that it demonstrates a pattern of wrongful conduct. See In re MRV Commons., Inc., No. 08-cv-3800-GAF, 2010 WL 1891717, at *2 (C.D. Cal. May 10, 2010) (citing In re Zoran Corp. Derivative Litig., 511 F. Supp. 2d 986, 1010 (N.D. Cal. 2007))). Therefore, even though Oswald lacks standing to bring claims arising out of pre-September 2014 conduct, such conduct is still relevant for this limited purpose.

Oswald also has standing to bring claims based on the Board's failing to conduct a legitimate investigation into Hart's wrongdoing, failing to hold Hart and Nelson to account, allowing Hart to repay substantially less than the total amount of money he diverted, and awarding Hart severance, because all of this conduct occurred after September 2014. See SAC ¶¶ 8, 44, 53. The Board took these actions in response to the Ruggiero Complaint, which was not filed until April 2015. Id.

## B. Demand Futility

There are two tests for demand futility under Delaware law: (1) the test articulated in Aronson, 473 A.2d at 814, and (2) the test articulated in Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993). The Aronson test applies where a majority of the board of directors

---

[4] Hart incurred many charges between 2013 and September 2014 for which he allegedly received improper reimbursement. See SAC ¶¶ 45–50. It is not clear when the reimbursements were granted or when the Board allowed the misuse.

who would consider a shareholder demand also made the challenged decision. See 473 A.2d at 814; see also Ryan v. Gifford, 918 A.2d 341, 353 (Del. Ch. 2007). The Rales test applies where the board on which demand would be made did not make the business decision challenged in the litigation (e.g., where a majority of the directors who made the decision have since been replaced, or where the challenged conduct is inaction by the board). 634 A.2d at 934. Here, because Oswald alleges that a majority of the current Board made the challenged business decisions, the Aronson test applies.

To demonstrate demand futility under Aronson, a shareholder plaintiff must create a reasonable doubt that either: "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgement." Aronson, 473 A.2d at 814. The test is disjunctive—a reasonable doubt as to either prong will establish demand futility. See id. at 815.

The parties are at odds regarding whether Oswald must plead demand futility as to a majority of the original six-member Board, or as to the current four-member Board. See SAC ¶¶ 96–109 (alleging demand futility as to six original directors); but see id. ¶ 96 n.4 (asserting that "[a]lthough plaintiff believes that demand futility is assessed as to the board in place when this action was commenced, demand would also be excused if demand futility were evaluated against the current Board. . . ."); MTD at iv (arguing that Oswald is incorrect to allege demand futility as to six original directors). However, because Defendants do not dispute that Hart is interested, Oswald can reach a majority of either Board by successfully challenging any two of Humphreys, Kremen, and Ousley.[10]

---

[10] No one suggests that there is any basis to challenge current Board member Shapiro.

Oswald argues that demand is futile based on both <u>Aronson</u> prongs.

### 1.    <u>Aronson</u> Prong 1: Interest

Under the first prong of <u>Aronson</u>, a plaintiff can displace the protection of the business judgement rule by alleging particularized facts that raise a reasonable doubt that a majority of the directors are either independent or disinterested.  <u>Aronson</u>, 473 A.2d at 814–15.  Directors are considered to lack independence if they are "under an influence which sterilizes their discretion," or beholden to and controlled by an interested party.  <u>Id.</u> at 815.  Directors are considered interested if they either "appear on both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."  <u>Id.</u> at 814.  A plaintiff can also show interest if a director faces a "substantial likelihood" of personal liability for approving the questioned transaction.  <u>See id.</u> at 815 (noting that this is rare, and that a "mere threat" of liability alone is insufficient).

Here, Oswald attempts to satisfy the first <u>Aronson</u> prong by showing that Humphreys and Kremen are not disinterested, either because (a) they personally participated in Hart's misuse of corporate funds, or (b) they voted to prematurely end the Special Committee investigation.  Neither argument succeeds.

### a.    Kremen's and Humphreys' participation in the misuse of Identiv's funds in Las Vegas

Oswald argues that Kremen and Humphreys are complicit in Hart's improper business expense reimbursements because they participated in the parties, enjoyed the benefits of the company's funds, and themselves submitted improper expenses related to the Las Vegas trips.  <u>See</u> SAC ¶¶ 98, 101.  Oswald argues that this behavior (i) exposes

13

Kremen and Humphreys to a substantial likelihood of liability, and (ii) amounts to self-dealing, making both directors interested. Id. ¶¶ 99, 102.[11]

### i. Likelihood of Liability

Defendants argue that Kremen and Humphreys do not face any likelihood of liability in connection with improper expenses because they are both exculpated by their corporation's certificate of incorporation for alleged breaches of their duty of care consistent with tit. 8 Del. Code § 102(b)(7). See McGrath Decl. Ex. 1 at 2. But Oswald alleges that Defendants breached their fiduciary duty of loyalty, see SAC ¶ 115, and Defendants are not exculpated for a breach of loyalty, see McGrath Decl. Ex. 1 at 2 ("A director of the Corporation shall not be personally liable . . . for breaches of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty . . .").

Defendants next argue that Humphreys and Kremen do not face a substantial likelihood of liability for improper expenses because Oswald has not pled that either knew that Hart was expensing the Las Vegas trips to Identiv. MTD at 5. But Oswald pled that Humphreys and Kremen themselves submitted reimbursement requests for expenses incurred at the parties. SAC ¶¶ 98, 101. At this stage, Oswald is entitled to the reasonable inference that if the directors submitted their own reimbursement requests (and thereby demonstrated a belief that the trip was a business trip), they knew that Hart would expense charges as well. See Rosenbloom, 765 F.3d at 1148. As Oswald remarks: "How Humphreys and Kremen could think they were attending a business event . . . and simultaneously not know the Company was paying the bill is a mystery." See Opp'n at 8

---

[11] In its Order dismissing Oswald's Amended Complaint, the Court noted that "[t]he Las Vegas trips raise questions about the independence and disinterest of both Kremen and Humphreys," but held that Oswald had not pled interest with particularity. Order at 3.

(citing MTD at 5 (arguing in one breath that the trip might have had a legitimate business purpose and in the next that Humphreys and Kremen did not know that Hart submitted any expenses)).[12]

Still, Oswald has not shown that the threat of liability that Humphreys and Kremen faced on this subject was substantial, or more than a "mere threat" of liability, as required by <u>Aronson</u>. The Delaware Supreme Court in <u>Aronson</u> noted that there will only be a substantial threat of liability "in rare cases [where] a transaction may be so egregious on its face that Board approval cannot meet the test of business judgment." 473 A.2d at 815. The allegations that Kremen received massages costings $1,900, or that Humphreys submitted nearly $1,000 in expenses for reimbursement in connection with a Las Vegas party, standing alone, are not "so egregious on [their] face" that the two directors face a substantial likelihood of liability. <u>See id.</u>

### ii. Self-Dealing

Similarly, Oswald's claims of self-dealing on the basis of these expenses fails, because Oswald has not shown that the benefits that Humphreys and Kremen gained from their participation in Hart's wrongdoing were material to them.

"[W]hen a party challenges a director's action based on . . . self-interest, that party

---

[12] Defendants argue that "[t]his case is on all fours with <u>In re Polycom, Inc. Deriv. Litig.</u>, 78 F. Supp. 3d 1006 (N.D. Cal. 2015)." MTD at 6. Not quite. <u>In re Polycom</u> sounds similar, as it involved allegations that a CEO "claimed reimbursements for numerous inappropriate personal expenses." <u>Id.</u> at 1011. In that case, the plaintiffs argued that demand should be excused because the board faced substantial liability for failing to adequately oversee the company's auditing and accounting controls. <u>Id.</u> at 1014. The court held that absent any evidence that the board knew that violations were occurring, it could not "simply infer the board knew or should have known of the problems with [the CEO's] expense reports." <u>Id.</u> at 1015–16. In this case, Oswald does not contend that the Board "must have known" of Hart's misconduct due to some vague "duty to be informed," <u>see id.</u> at 1016, but points to Humphreys' and Kremen's own conduct alongside Hart's. <u>See</u> Opp'n at 8 ("Kremen and Humphreys were both present, received personal luxuries paid for by Identiv, and submitted for reimbursement expenses incurred at those parties.").

15

must allege that the director's interest is material to that director." <u>Solomon v. Armstrong</u>, 747 A.2d 1098, 1118 (Del. Ch. 1999), <u>aff'd</u>, 746 A.2d 277 (Del. 2000); <u>see also</u> <u>Cinerama, Inc. v. Technicolor</u>, 663 A.2d 1156, 1167 (Del. 1995) (courts must consider whether the benefit is material to the "actual person," not use an objective "reasonable person" standard). "Materiality means that the alleged benefit was significant enough '<u>in the context of the director's economic circumstances</u>, as to have made it improbable that the director could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest.'" <u>Orman v. Cullman</u>, 794 A.2d 5, 23 (Del. Ch. 2002). Establishing that a director "expect[s] to derive [a] personal financial benefit from [a transaction]" that is not enjoyed by the corporation or all stockholders generally, <u>Aronson</u>, 473 A.2d at 814, does not alone establish that the director is interested—the benefit must also be material to that director. <u>Cinerama</u>, 663 A.2d at 1167.

However, materiality is not required for classic self-dealing, where the director "appear[s] on both sides of a transaction." <u>Orman</u>, 794 A.2d at 25 n.50. Oswald's argument that the benefits Kremen and Humphreys received need not be material relies on such cases. <u>See</u> Opp'n at 9 (citing <u>Calma v. Templeton</u>, 114 A.3d 563, 576 (Del. Ch. 2015) (challenging directors' award of restricted stock units to themselves); <u>Cambridge Ret. Sys. v. Bosnjak</u>, No. 9178-CB, 2014 Del. Ch. LEXIS 107, at *11 (Ch. June 26, 2014) (challenging directors' payment of compensation to themselves); <u>London v. Tyrrell</u>, Civil Action No. 3321-CC, 2008 Del. Ch. LEXIS 75, at *14–15 (Ch. June 24, 2008) (challenging directors' grant of stock options to themselves); <u>In re Investors Bancorp, Inc. Stockholder Litig.</u>, No. 12327-VCS, 2017 Del. Ch. LEXIS 53, at *16 n.9 (Ch. Apr. 5, 2017) (challenging directors' grant of equity awards to themselves)). These cases stand for

the proposition that when directors decide matters of their own compensation, they stand on both sides of a transaction with the company, and so materiality is not required.  Id.

Here, there is no allegation that Kremen and Humphreys approved their own expenses, set their own salaries, or awarded themselves stock options.  They did not stand on both sides of that kind of transaction.  Thus, in order to show their interest, Oswald must show that the benefits that Kremen and Humphreys received by participating in Hart's Las Vegas parties were material.  See Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 364 (Del. 1993).  Oswald has not pled with particularity that these benefits (Kremen's $1,900 in massages and Humphreys' nearly $1,000 in reimbursed expenses) were material. Oswald has not raised a reasonable doubt that Kremen and Humphreys are disinterested on the basis of their receiving benefits from Hart's misuse of corporate funds.

> **b.**     **The Board's vote to end the Special Committee's investigation prematurely**

Oswald also argues that Humphreys and Kremen were interested in any demand regarding their vote to end the Special Committee investigation because they participated in the conduct that was under investigation.[13]

Defendants argue that Humphreys and Kremen could not have been interested because the scope of the Special Committee's investigation was so narrow that it only included Hart's improper expenses and conduct.  See MTD at 13.  In fact, the Board

---

[13] In its Order dismissing Oswald's Amended Complaint, the Court held that Oswald had not pled interest with particularity, noting that "the procedures, findings, conclusions, and recommendations of the Special Committee remain unknown."  Order at 4.  Although the Amended Complaint vaguely referred to a "sham Special Committee investigation," see, e.g., FAC ¶¶ 83–84, the Second Amended Complaint includes more extensive allegations about the circumstances of the Board's "premature conclusion" of the investigation, see, e.g., SAC ¶¶ 70, 71, 78, 79, 106.

directed the Special Committee to investigate "the facts, allegations and circumstances" of the Ruggiero Complaint, and "any similar or related facts." SAC ¶ 53; McGrath Decl. Ex. 15. Kremen and Humphreys were named in the Ruggiero Complaint, and the Deloitte Report shows inspection of expenses that Kremen and Humphreys enjoyed and possibly incurred. See id. ¶¶ 99, 102; see generally Deloitte Spreadsheet. At this stage, Oswald is entitled to a broad reading of the scope of the investigation, because it is a reasonable inference that investigators considered the conduct of Kremen and Humphreys to be similar or related to that of Hart. See Rosenbloom, 765 F.3d at 1148.

Oswald argues that Humphreys and Kremen "stood on both sides" here because they voted to end an investigation into their own conduct. Opp'n at 11. Although intuitively it seems correct that Humphreys and Kremen would be "interested" in an investigation into their participation in alleged wrongdoing, it is not clear that voting to end an internal investigation falls within the definition of a "self-dealing transaction" as contemplated by Delaware law. Oswald has not cited any precedent for the assertion that transactions bestowing non-financial benefits qualify as self-dealing.[14] Every case that Oswald cites in his brief involves self-dealing in the context of financial transactions. See, e.g., Opp'n at 11 (citing In re Brocade, 615 F. Supp. 2d at 1047 (evaluating interest where "Defendants received and exercised failed options"); Calma, 114 A.3d 563, 575 (evaluating interest where defendants awarded themselves restricted stock units as compensation)). It does not appear that any court has applied the self-dealing doctrine in

---

[14] Defendants incorrectly cite Cinerama, 663 A.2d at 1169, for the proposition that self-dealing only occurs "when a director deals directly with the corporation, or has a stake in or is an officer or director of a firm that deals with the corporation." See MTD at 7–8. In fact, Cinerama cites these as "example[s]" of self-dealing. 663 A.2d at 1169.

this way yet.

Oswald does cite to one Delaware case which evaluated a non-financial transaction similar to the one here, but the court in that case seems to have excused demand under the second prong of <u>Aronson</u>, not the first.  <u>See</u> Opp'n at 11 (citing <u>In re China Agritech, Inc.</u>, No. 7163-VCL, 2013 Del. Ch. LEXIS 132, at *68 (May 21, 2013)); <u>In re China Agritech, Inc.</u>, 2013 Del. Ch. LEXIS 132, at *65 ("The members of the Audit Committee could not properly consider a litigation demand regarding the termination of the Company's outside auditors because the allegations of the Complaint support a reasonable inference that they <u>failed to act in good faith</u>.") (emphasis added); <u>id.</u>, at *68 ("The actions of four of the seven members of the Demand Board were at issue in the Special Committee investigation. . . . these directors could not properly consider a demand under <u>Aronson</u> that asked them to assert litigation relating to the Audit Committee's termination of the outside auditors or management's related activities." ).[15]

Rather than rely on a novel interpretation of self-dealing, the Court will follow <u>In re China Agritech</u>.  Analysis of the Board's decision to end the investigation prematurely and without investigating the potential bribery issue fits squarely in the good faith analysis of the second prong of <u>Aronson</u>.

### 2. <u>Aronson</u> Prong 2: Valid Exercise of Business Judgment

Under the second prong of <u>Aronson</u>, demand is excused as futile where a plaintiff

---

[15] <u>In re China Agritech</u> did recognize that a CEO risked liability in connection with his company's terminating its outside auditors, <u>see id.</u>, at *65 ("Chang could not properly consider a litigation demand regarding the termination of the Company's outside auditors because his role in management as the Company's CEO gives rise to a reasonable inference that he would face personal and professional risk in any litigation over the dispute, making him interested in the outcome."), arguably invoking the first <u>Aronson</u> prong, but it did not characterize such conduct (much less the rest of the board's conduct) as "self-dealing."

19

can raise a reasonable doubt that the challenged transaction was a valid exercise of business judgement. Aronson, 473 A.2d at 814. A showing that directors were grossly negligent or acted in bad faith directly rebuts the business judgement presumption. In re Walt Disney Co. Deriv. Litig., 906 A.2d 27, 52 (Del. 2006). Aronson explained that "to invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them," and they "must then act with requisite care[16] in the discharge of their duties." 473 A.2d at 812.

Here, Oswald attempts to satisfy the second Aronson prong by showing that Humphreys and Kremen (a) acted in bad faith when they voted to prematurely end the Special Committee investigation, and (b) committed waste by awarding Hart severance and permitting him to only repay a portion of the funds that he diverted for personal use. The Court agrees that Oswald has raised a reasonable doubt that Humphreys and Kremen acted in good faith.

### a.    Bad Faith

Under Delaware law, bad faith exists where a director acts with "intentional dereliction of duty" or "conscious disregard for [his or her] responsibilities." In re Walt Disney, 906 A.2d at 66. It is also bad faith where a fiduciary "acts with the intent to violate applicable positive law" or "intentionally acts with a purpose other than that of advancing the best interests of the corporation." Id. at 67.

Oswald urges the Court to infer that the Board knowingly decided not to find out if a crime had been committed. See Opp'n at 13. This is a reasonable inference to make at

---

[16] Under Delaware law, director liability is predicated upon concepts of gross negligence. Id.

this stage, and it is based entirely on information that is newly alleged in the Second

Amended Complaint.  Because Deloitte discussed its review of the challenged expenses

with the Board, see SAC ¶¶ 57, 59, it is reasonable to infer that before the Board voted to

end the investigation, Humphreys and Kremen knew that their participation and expenses

had turned up as improper in the Deloitte Report, and that the entire Board knew that

Deloitte believed that there was a "potential bribery issue" during one of the Las Vegas

parties.  Id.  The Court can also reasonably infer that Humphreys, Kremen, and Ousley

knew of BDO's position that further investigation was vital, as described in BDO's

November 23, 2015 letter addressed to the entire Board.  See id. ¶ 78 (describing "multiple

requests by BDO" to investigate further "[s]ince October 17, 2015").

With this knowledge, the Board nonetheless chose to terminate the Special

Committee's investigation, and to keep it closed.  The "knowing and intentional" approval

of wrongdoing to the benefit of insiders "cannot be an exercise of business judgment."  See

Ryan, 918 A.2d at 354; see also In re Atmel Deriv. Litig., No. 06-4592 JF (HRL), 2008

U.S. Dist. LEXIS 91909, at *22 (N.D. Cal. June 25, 2008).  Where a Board "intentionally

conceals the nature of its earlier actions, it is reasonable for a court to infer that the act

concealed was itself one of disloyalty that could not have arisen from a good faith business

judgment."  In re Tyson Foods, Inc. Consol. S'holder Litig., No. 1106-CC, 2007 Del. Ch.

LEXIS 120, at *12–13 (Ch. Aug. 15, 2007).

Defendants argue that rather than adequately alleging bad faith, Oswald is

improperly second-guessing the Board's actions.  See MTD at 10 (citing In re Autodesk,

Inc., S'holder Deriv. Litig., No. 06-cv-7185-PJH, 2008 U.S. Dist. LEXIS 101015, at *21

(N.D. Cal. Dec. 15, 2008) ("an attack on a Board's internal investigation is improper in the

21

context of a demand futility argument, because such an argument depends on the premise that the plaintiff has necessarily abandoned the Board as a vehicle for righting the wrongs complained of")). But Oswald does not second-guess the decision to end the investigation; he alleges that it was not made in good faith. See Opp'n at 13. Additionally, in <u>In re Autodesk</u>, the court was evaluating interest under the <u>Rales</u> test, not good faith under <u>Aronson</u>'s second prong (which is not available as a path to establish demand futility under the <u>Rales</u> test), and "the actions being investigated (options backdating) were not actions of the Audit Committee or the Board." <u>In re Autodesk</u>, 2008 U.S. Dist. LEXIS 101015, at *25. In contrast, here half the current Board participated in the conduct being investigated.[17]

Defendants also rely on <u>In re Am. Apparel, Inc., 2014 Deriv. S'holder Litig.</u>, 2015 WL 12724070, at *19–20 (C.D. Cal. April 28, 2015), which held that "disputes" about the "appropriate response" to misconduct were subject to "difference[]s in interpretation" and were, in that case, "insufficient to establish the [board] acted in bad faith." <u>See</u> MTD at 10 n.18. As in <u>In re Autodesk</u>, the misconduct at issue in <u>In re American Apparel</u> was entirely that of the CEO, not the board itself. <u>See</u> <u>id.</u> at *2 ("[t]his action emerges out of the behavior of American Apparel founder . . . Charney, and the Company's decision to

---

[17] Defendants argue that it is irrelevant whether Humphreys and Kremen were under investigation, because "at the time the Special Committee's recommendations were approved, the Board consisted of five outside directors (Humphreys, Kremen, Alazem, Ousley, and Wenzel), and so "even without Humphreys' and Kremen's votes, there was still a majority and quorum on the Board to approve concluding the investigation." MTD at 13. There are at least two problems with that assertion. First, it is problematic that Humphreys and Kremen even participated in the discussion and decision of whether to end the Special Committee's work, rather than recusing as Hart presumably did. Second, the SAC alleges that it was only "the non-committee board members" who "unanimously accepted the recommendation of the Committee," suggesting that Humphreys and Kremen were two of three Board members who made the decision, rather than two of five. See SAC ¶ 71. This is a reasonable inference to draw at this stage of the litigation.

terminate him as CEO in June 2014.").  Moreover, the plaintiffs in that case had alleged that the board breached its duty "by not acting earlier," and therefore had to allege with specificity "why the Board's <u>delay</u> in suspending and ultimately terminating Charney was a breach of their duties."  <u>Id.</u> at *19.  Plaintiffs failed to allege "the point at which the Board was acting in bad faith by retaining Charney."  <u>Id.</u>  Here, Oswald has not alleged that the Board should have taken action against Hart at some earlier point.  The issue is instead the Board's decision to conclude the Special Committee investigation, where that investigation involved Humphreys' and Kremen's own expenses along with Hart's, and a "potential bribery issue," despite being urged not to do so by Deloitte, independent counsel, and BDO.  <u>See</u> SAC ¶¶ 57, 59, 71, 78.[18]

Defendants' further argument that the Board must have acted in good faith because the company spent "nearly $3 million" on the investigation only to recover "pennies" also falls flat.  <u>See</u> MTD at 12.  "[D]irectors [are] entitled to a presumption that they can and should be allowed to manage the business affairs of a corporation, including the decision of whether and how to investigate errors."  <u>In re Comput. Scis. Corp. Derivative Litig.</u>, 244 F.R.D. 580, 591 (C.D. Cal. 2007).  But this presumption is rebutted if a plaintiff pleads "particularized allegations showing the Board is unworthy of this deference."  <u>Id.</u> Defendants argue that Deloitte's investigation only identified approximately $164,000 worth of expenses that had insufficient documentation submitted to support a business

---

[18]  Defendants also cite to <u>In re FalconStor Software, Inc.</u>, 966 N.Y.S.2d 642, 655 (N.Y. Sup. Ct. 2013) for the proposition that "conduct[ing] its internal investigation [is] exactly the kind of action[] that [is] entrusted to a board of directors and which the Delaware courts state they are reluctant to question."  MTD at 10 n.18.  But the court in that case, a New York Supreme Court, prefaced that observation by stating that "not a single one of the current members of the board of directors was implicated [in the litigation]," or "knew or indeed had reason to know that they were violating the shareholder plan."  <u>Id.</u> at 654–55.  That makes <u>In re FalconStor</u> distinguishable.

expense or that "appear[ed] to be non-business, personal" expenses.  MTD at 12.  This figure does not include the $354,528.36 in charges that Deloitte classified as possible business expenses incurred in violation of Company policy.  See SAC ¶ 62.  It also does not account for the items that the Board approved classifying as business expenses, overriding Deloitte's conclusion that the purpose provided was not sufficient to support business purpose.  See id.  According to the Deloitte Spreadsheet, many of Hart's Las Vegas expenses fall into this category.  See generally Deloitte Spreadsheet; compare id. column Q ("no") with id. column S (amount approved by Board as business expense).  Even if $164,000 is the proper figure, Identiv only recovered $35,784 from Hart.  SAC ¶ 89.  These figures, combined with the inference that the Board knowingly chose not to investigate whether a crime had been committed, raise a reasonable doubt that the Board's "decision of whether and how to investigate errors" is worthy of deference.  See In re Comput. Scis., 244 F.R.D. at 591.

Oswald has raised a reasonable doubt that the Board acted in good faith when it voted to end the investigation.  Oswald has pled particularized facts raising an inference that the Board knowingly decided—contrary to the advice of independent counsel, Deloitte, and BDO—not to get to the bottom of its executives' expenses or find out if a crime had been committed.  This amounts to a "conscious disregard for [their] responsibilities," which is bad faith.  See In re Walt Disney, 906 A.2d at 66.

Because Oswald has raised a reasonable doubt that the challenged action was made in good faith, demand on the Board is excused as futile.  See Aronson, 473 A.2d at 814.  The Court therefore DENIES the Motion to Dismiss.

### b.     Waste

Because Oswald prevails on his argument about bad faith, he need not also prevail on his argument about waste. Indeed, the Court holds that Oswald has not established demand futility on this ground.

To state a claim for corporate waste, a plaintiff must show that "the Board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's bests interests." White v. Panic, 783 A.2d 543, 554 n.36 (Del. 2001). This requires the plaintiff to demonstrate that "an exchange was so one-sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." In re Walt Disney, 906 A.2d at 74. Waste often entails "a transfer of corporate assets that serves no corporate purpose, or for which no consideration at all is received." Brehm, 746 A.2d at 263. A "mere disagreement cannot serve as grounds for imposing liability based on alleged . . . waste." Id. at 266. Thus, a corporate waste claim fails "if there is any substantial consideration received by the corporation, and . . . there is a good faith judgment" that under the circumstances the transaction was worthwhile. White, 783 A.2d at 554.

Oswald argues that the Board committed waste because it chose not to fire Hart for cause, allowed him to receive severance under his employment agreement, and allowed him to repay only a fraction of the funds he allegedly diverted for personal use. Opp'n at 15. These allegations do not overcome the "high hurdle" necessary to challenge the "great deference" the Board is granted in this area. See Brehm, 746 A.2d at 262–63. Oswald has not pled that Hart was of zero value to Identiv. Thus, the Court cannot assume that his severance was in exchange for nothing. Furthermore, whether to terminate Hart for cause

and risk litigation is left to the sound discretion of the Board.  See <u>White</u>, 783 A.2d at 554.

Because Identiv's decision not to fire Hart for cause could "have been based on a valid assessment of the corporation's bests interests," it cannot be considered wasteful for purposes of demand futility.  See <u>White</u>, 783 A.2d at 554 n.36

## IV.   CONCLUSION

For the foregoing reasons, Oswald has pled sufficient particularized facts to demonstrate demand futility under the second prong of <u>Aronson</u>.  Oswald has created a reasonable doubt that the Board acted in good faith in its decision to end the Special Committee investigation.  Thus Oswald has met his burden under Rule 23.1.  The Court DENIES Defendant's Motion to Dismiss the Second Amended Complaint.

**IT IS SO ORDERED.**

Dated: October 27, 2017



_____
CHARLES R. BREYER
United States District Judge