United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RYAN OSWALD,

    Plaintiff,

v.

IDENTIV, INC., et al.,

    Defendants.

Case No. 16-cv-00241-CRB

**ORDER GRANTING MOTIONS TO DISMISS**

In October of last year, this Court denied Defendant Identiv, Inc.'s motion to dismiss. See Identiv MTD (dkt. 43); Demand Futility Order (dkt. 56). Now three sets of defendants— (1) former CEO Jason Hart, see Hart MTD (dkt. 67); (2) former CFO Brian Nelson, see Nelson MTD (68); and (3) board chairman James Ousley, board member Steven Humphreys, and board member Gary Kremen, see OHK MTD (dkt. 64-4)—move to dismiss on additional grounds.[1] Plaintiff Ryan Oswald opposes. See Opp'n (dkt. 73-3). Because the Court agrees with the defendants that the Second Amended Complaint ("SAC") (dkt. 38-3) fails to state a claim, the Court GRANTS all three motions.

**I.    THE DEMAND FUTILITY ORDER**

The Court summarized the SAC's allegations in the Demand Futility Order, and will not repeat them herein. See Demand Futility Order at 2–9. For present purposes, however, some discussion of the Demand Futility Order itself is necessary. That order resolved a motion brought by Identiv alone; the parties had stipulated that the individual

---

[1] Identiv's joinder in these defendants' motions, see Notice of Joinder (dkt. 66), is improper as Plaintiff Ryan Oswald is currently litigating the case on Identiv's behalf, see Demand Futility Order. Accordingly, the Court STRIKES the joinder.

1    defendants need not respond to the complaint unless and until the Court determined that

2    demand was excused. See Stipulation and Order Staying Proceedings (dkt. 15) at 2;

3    Amended Stipulation (dkt. 36) at 1; Identiv MTD (dkt. 43). Identiv's motion was based on

4    standing as well as demand futility. See generally Identiv MTD.

5          As to standing, the Court held that Oswald lacked standing to bring derivative

6    shareholder claims based on conduct that occurred before he became a shareholder on

7    September 24, 2014. Demand Futility Order at 10–11 (citing Fed. R. Civ. P. 23.1(b)(1)).

8    The Court held that Oswald did have standing to challenge board actions in response to the

9    Ruggiero Complaint, which was filed in April 2015. Id. at 11.

10         As to demand futility, Oswald had argued that demand was excused under both

11   prongs of Aronson v. Lewis, 473 A.2d 805 (Del. 1984), because he had alleged

12   particularized facts raising a reasonable doubt that "(1) the directors are disinterested and

13   independent; [and] (2) the challenged transaction was otherwise the product of a valid

14   exercise of business judgment." Opp'n to Identiv MTD (dkt. 44-2) at 5 (citing Aronson,

15   473 A.2d at 814–15). The Court rejected Oswald's arguments under prong one that

16   Humphreys and Kremen were interested because they personally participated in Hart's

17   misuse of funds and because they voted to prematurely end the Special Committee's

18   investigation. See Demand Futility Order at 13–19. The Court then examined Oswald's

19   arguments under prong two that the challenged transaction was not a valid exercise of

20   business judgment because Humphreys and Kremen voted to prematurely end the Special

21   Committee's investigation and committed waste in awarding Hart severance and

22   permitting him to only repay a portion of the misappropriated funds. See id. at 20–26.

23   The Court held that, while Oswald had not established demand futility on the basis of

24   waste, id. at 25–26, Oswald had "raised a reasonable doubt that" the decision to terminate

25   the investigation "was made in good faith," id. at 24. The Court held that "Oswald had

26   pled particularized facts raising an inference that the Board knowingly decided—contrary

27   to the advice of independent counsel, Deloitte, and BDO—not to get to the bottom of its

28   executives' expenses or find out if a crime had been committed. This amounts to a

'conscious disregard for [their] responsibilities,' which is bad faith." Id. (quoting In re Walt Disney Co. Derivative Litig., 906 A.2d 27, 66 (Del. 2006)). The Court therefore concluded that "Oswald ha[d] created a reasonable doubt that the Board acted in good faith in its decision to end the Special Committee investigation," and so he had established demand futility under Rule 23.1. Id. at 26.

It was a close question whether Oswald satisfied Aronson's prong two, which is reserved for particularly egregious board action that does not meet prong one. See Protas v. Cavanagh, No. 6555-VCG, 2012 WL 1580969, at *9 (Del. Ch. May 4, 2012) (prong two "something of a last resort that, in extreme circumstances, provides the court with the basis to review a transaction despite the appearance of otherwise independent and disinterested fiduciaries"); Greenwald v. Batterson, No. 16475, 1999 WL 596276, at *7 (Del. Ch. July 26, 1999) ("substantial burden" to satisfy prong two, which is "directed to extreme cases in which despite the appearance of independence and disinterest a decision is so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review") (internal quotation marks omitted). The Demand Futility Order held that the SAC had done enough. See Demand Futility Order at 24.

What the Demand Futility Order should not have done was echo Oswald's language about bad faith. See Demand Futility Order at 20–24. Oswald satisfied Aronson prong two because he "raise[d] a reasonable doubt that the challenged transaction was a valid exercise of business judgment." See Demand Futility Order at 20 (citing Aronson, 473 A.2d at 814); see also id. at 24 ("reasonable doubt that the Board's 'decision of whether and how to investigate errors' is worthy of deference") (citing In re Computer Scis. Corp. Derivative Litig., 244 F.R.D. 580, 591 (C.D. Cal. 2007).[2] The order's extraneous language about "bad faith" was dicta—it was unnecessary to the Court's holding, and it muddied the

---

[2] This, too, is a high standard to meet. "'[A] court will not substitute its judgment for that of the board if the latter's decision can be attributed to any rational business purpose.'" See Greenwald, 1999 WL 596276, at *7 (quoting Unocal Corp. v. Mesa Petroleum Co., Del. Supr., 493 A.2d 946, 954 (1985) (internal quotation marks omitted)).

3

waters for the present motions.[3]

The Court now turns to the impact of the Demand Futility Order.

### A. The Waste Claim

Courts assess demand futility on a claim by claim basis, and should dismiss any claims for which the plaintiff does not plead particularized facts showing that demand would have been futile. See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 833 A.2d 961, 977 n.48 (Del. Ch. 2003) ("Demand futility analysis is conducted on a claim-by-claim basis"); Needham v. Cruver, Nos. 12428, 12430, 1993 WL 179336, at *3 (Del. Ch. May 12, 1993) ("pre-suit demand futility analysis must be conducted for each claim in a stockholder derivative action."). In response to Identiv's motion to dismiss, Oswald made specific arguments as to why demand was futile. See Opp'n to Identiv MTD. The Court rejected Oswald's arguments about demand futility as to the waste claim. See Demand Futility Order at 25–26. Because Oswald did not meet the demand futility requirement as to the waste claim, that claim is out of the case.

Oswald seems to understand this, because he concedes that "[t]he Order held that demand was not excused on the basis that [defendants] committed waste by their decision not to fire Hart, and to allow him to depart the Company with severance, and allow him to repay only a fraction of the funds he misappropriated. . . . Plaintiff acknowledges that the Order is the law of the case and concedes that a waste claim is not stated in connection with those acts." Opp'n at 13 n.7. But he goes on to argue that the Demand Futility Order did not dismiss "waste claims related to the improper expenses incurred by Hart and others." Id. This is not how it works. Oswald made an argument that demand was futile as to waste. See Opp'n to Identiv MTD at 15 ("A Majority of the Board Committed Waste"). The Court's Demand Futility Order held that "Oswald has not established demand futility on this ground." Demand Futility Order at 25. The Court did not hold that

---

[3] See, e.g., Opp'n at 12 ("The law of the case is therefore that the SAC alleges Humphreys and Kremen did not act in good faith . . . sufficient to overcome the more onerous pleading burden on a Rule 23.1 motion.").

4

Oswald had established demand futility for any portion of the waste claim. It is therefore out.[4]

What remains is the breach of fiduciary duty claim based on the termination of the Special Committee investigation. See Demand Futility Order at 26 (Oswald "pled sufficient particularized facts to demonstrate demand futility" as to the Board's "decision to end the Special Committee investigation.").

### B. Hart and Nelson

The Demand Futility Order also eliminates the claims against Hart and Nelson, full stop. This is because neither man participated in the decision to terminate the Special Committee investigation, and that decision is the only ground for which the Court has found demand futility. See id.[5] But it is also because of the Demand Futility Order's holding that Oswald "lacks standing to bring claims arising out of pre-September 2014 conduct." See id. at 11. All of the SAC's allegations about Hart and Nelson occurred before Oswald became a shareholder on September 24, 2014. See id. at 10; SAC.

The SAC alleges that Hart submitted improper expenses, and that Nelson rubber-stamped them, in 2013 and 2014. See SAC ¶¶ 45–50. Ana Ruggiero, Hart's executive assistant, allegedly asked Hart for documentation of his expenses, and he would tell her to "just figure it out." Id. ¶ 45. Ruggiero allegedly brought the improper expenses to Nelson's attention, and he "merely responded that he would speak with Hart." Id. ¶ 48.

---

[4] Even if some portion of the waste claim had survived the demand futility stage, the SAC would still fail to state a claim as to waste, for the same reasons the Court explained in the Demand Futility Order. See Demand Futility Order at 25–26 (collecting authority about how difficult it is to plead waste claims, including standard that transfer of assets "serve[] no corporate purpose" or that "no consideration at all is received.").

[5] The Court observes that the SAC does not even attempt to allege particularized facts showing demand futility with respect to the claims against Nelson. The SAC argues that "Pre-Suit Demand Is Excused Because a Majority of the Board Members Face A Substantial Risk of Liability For Their Own Misconduct," and it includes allegations that the Board is incapable of fairly considering claims against itself. See SAC at 35. Nelson was not a member of the Board, and the section does not allege that the Board would be unable to pursue claims against him. See In re Capital One Derivative S'holder Litig., 952 F. Supp. 2d 770, 791–92 (E.D. Va. 2013) ("Plaintiffs have not pled any particularized facts indicating that the directors would be unable to evaluate independently and disinterestedly whether Capital One should sue the officers").

Although the opposition argues that "[t]hese misuses were ongoing when [Oswald] became an Identiv stockholder," citing to the Deloitte spreadsheet, the SAC does not include any subsequent expenses, nor does it generally allege that the transactions continued after September 24, 2014. See Opp'n at 14; SAC. Defendants' motions are based on what is in the SAC now. See Schneider v. Dep't of Corrections, 151 F.3d 1194 (9th Cir. 1998) (face of complaint and exhibits attached thereto control motion to dismiss). The Court rejects the argument Oswald made at the motion hearing that, at the defendants' request, the Court has already taken judicial notice of the Deloitte spreadsheet, which includes expenses "well into 2015." The Court looked at the spreadsheet in connection with the last motion to dismiss, which Identiv alone brought. Oswald is limited to what he alleged in the SAC.

Even so, Oswald argues that there are two sets of allegations in the SAC that raise questions of fact, preventing the Court from granting Defendants' motions.

First, Oswald notes that one of the Las Vegas trips that Hart and Nelson attended was apparently on September 19, 2014. See SAC ¶ 48 (July 4, 2914 Las Vegas trip); id. ¶ 50 (second Las Vegas trip); Opp'n at 15 n.8 (providing September 19, 2014 date, not included in SAC). Oswald argues that "[i]t is a reasonable inference that these expenses had not even been submitted for reimbursement by September 24, when plaintiff purchased his stock." Opp'n at 15 n.8. He points to case law holding that determining when a transaction is complete is fact-specific, and that the derivative standing statute "should not be construed so as to unduly encourage the camoflaging of transactions and thus prevent reasonable opportunities to rectify corporate aberrations." Opp'n at 15 (citing MacLary v. Pleasant Hills, Inc., 109 A.2d 830, 833 (Del. 1954)). Oswald argues that "claims for expenses incurred by defendants prior to September 24, 2014 should not be dismissed now unless it is clear that the transaction was complete prior to that date." Id. But there is no suggestion in the SAC that Hart and Nelson camoflaged their transactions through delay. Even if the SAC had alleged that Hart and Nelson had not yet submitted their expenses for the September Las Vegas trip at the time that Oswald bought stock, it

6

does appear that "each of the wrongs, if they be that, he claims occurred [before] he became a stockholder can be easily segmented from any wrongs that occurred [after]." See Desimone v. Barrows, 924 A.2d 908, 926 (Del. 2007); see also Conrad v. Blank, 940 A.2d 28, 41 n.35 (Del. Ch. 2007) (interpreting MacLary as articulating a narrow "continuing wrong" exception). Accordingly, there is no basis in the SAC to infer that Oswald has standing in connection with the September Las Vegas trip.

Next, Oswald argues that "[t]he improper equity compensation in exchange for Nelson's silence on Hart's behavior and in return for the personal loan to Hart did not accrue until October 2014." Opp'n (citing SAC ¶ 70). But the SAC alleges that "in the summer of 2014," Nelson loaned Hart $26,000 to help him pay an American Express bill, and "[s]hortly thereafter, 'Nelson suddenly received approximately $1,000,000 in shares from Identiv.'" SAC ¶ 49. The SAC further alleges that "the Company's preliminary proxy filed on April 17, 2015 discloses that the RSUs awarded to defendant Nelson on July 1, 2014, were valued by the Company [] at $902,850." Id. at 13 n.2. The October 2014 date that Oswald now points to appears to be a reference in the SAC to the compensation committee approving bonuses for Hart and Nelson in October 2014—it is not clear that it refers to the same money. See SAC ¶ 70. But even if receiving a bonus is a plausible basis for liability[6] and even if it happened after Oswald became a shareholder, the Court held in the related securities case that the allegation that the Board awarded Nelson $1,000,000 in stock in exchange for his giving Hart a $26,000 personal loan "is not even plausible" and is based entirely on Ruggiero's speculation. See Order Granting Motions to Dismiss in Rok v Identiv, No. 15-cv-5775-CRB (dkt. 73) (Jan. 4, 2017) at 21. The Court reaches the same conclusion here.

Because the SAC's allegations about Hart and Nelson all fall before September 24, 2014, Oswald lacks standing to bring suit against both defendants.

---

[6] Nelson cites to authority holding that a claim for waste cannot be stated against a recipient, as opposed to a grantor, of backdated stock options. See Nelson MTD at 16. He does not cite to any authority pertaining to a breach of fiduciary duty claim against a recipient of an improper award. See id.

7

## II. THE BREACH OF FIDUCIARY DUTY CLAIM AGAINST OUSLEY, HUMPHREYS, AND KREMEN

What remains in the case after the Demand Futility Order is the breach of fiduciary duty claim against Ousley, Humphreys, and Kremen based on the decision to terminate the Special Committee investigation. See Demand Futility Order at 26. Ousley, Humphreys, and Kremen move to dismiss this claim. See OHK MTD.

### A. Legal Standard

Because Oswald has not alleged a unified course of fraudulent conduct or allegations of fraud alongside non-fraud claims, Federal Rule of Civil Procedure 8, rather than Federal Rule of Civil Procedure 9, applies. See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103–04 (9th Cir. 2003). Pursuant to Rule 8, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While it need not contain detailed factual allegations to withstand a motion to dismiss, the complaint must allege enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks omitted). In reviewing a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).

### B. Discussion

#### 1. Bad Faith

The SAC alleges that each defendant owes a "duty to exercise candor, good faith,

8

and loyalty" to Identiv, and that each breached those duties with the conduct complained of therein. SAC ¶¶ 111, 112. It alleges that the defendants "knowingly or recklessly . . . conducted the sham Special Committee investigation" and that they "breached their duty of loyalty by . . . failing to conduct a legitimate investigation into the wrongdoing, and failing to hold defendants Hart and Nelson to account for their wrongdoing." Id. ¶¶ 114, 115. It is not entirely clear which duties Oswald alleges have been breached, see Opp'n at 9, but it does not really matter.

The SAC's allegations about the termination of the investigation might fall under the heading of breach of the duty of care. See In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 967 (Del. Ch. 1996) (liability flowing from board decision, rather than inaction, analyzed under business judgment rule as duty of care case). Ordinarily, duty of care claims require a showing that the directors acted with gross negligence. See Benihana of Tokyo, Inc. v. Benihana, Inc., 891 A.2d 150, 192 (Del. Ch. 2005). Gross negligence means "'reckless indifference to or a deliberate disregard of the whole body of stockholders or actions that are without the bounds of reason.'" Id. (quoting Tomczak v. Morton Thiokol, Inc., No. 7861, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990)). But here, Identiv's certificate of incorporation exculpates Ousley, Humphreys, and Kremen for breaches of the duty of care, consistent with title 8 of the Delaware Code, section 102(b)(7). OHK MTD at 4–5 n.2; McGrath Decl. Ex. 1 at 2. Identiv's directors are not exculpated from, among other things, breaches of the duty of loyalty or for breaches of the duty of care that rise to the level of bad faith. See 8 Del. C. § 102(b)(7). Accordingly, to plead a non-exculpated breach of the duty of care claim here, Oswald must plausibly allege bad faith. See In re Cornerstone Therapeutics, Inc. S'holder Litig., 115 A.3d 1173, 1179–80 (Del. 2015); see also Opp'n at 9 (arguing that "the SAC amply alleges that [defendants] failed to act in good faith").

Arguably, because the SAC alleges (as an alternative to mere reckless conduct) the knowing dereliction of responsibility in terminating the investigation, the relevant duty is a duty of loyalty—but that also requires a showing of bad faith. See McPadden v. Sidhu,

9

1 964 A.2d 1262, 1274 (Del. Ch. 2008) ("from the sphere of actions that was once classified as grossly negligent conduct that gives rise to a violation of the duty of care, the Court has carved out one specific type of conduct—the intentional dereliction of duty or the conscious disregard for one's responsibilities—and redefined it as bad faith conduct, which results in a breach of the duty of loyalty."); see also Opp'n at 9 (arguing that "the SAC amply alleges that [defendants] . . . breached their duty of loyalty").

To the extent that the SAC pleads a breach of the duty of oversight, that would also require a showing of bad faith. See In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 123 (Del. Ch. 2009) ("to establish oversight liability a plaintiff must show that the directors <u>knew</u> that they were not discharging their fiduciary obligations or that the directors demonstrated a <u>conscious</u> disregard for their responsibilities such as by failing to act in the face of a known duty to act. The test is rooted in concepts of bad faith; indeed, a showing of bad faith is a <u>necessary condition</u> to director oversight liability."); Robert T. Miller, The Board's Duty to Monitor Risk After Citigroup, 12 U. Pa. J. Bus. L. 1153, 1162 (2010) ("No matter what the judge-made law concerning the duty to monitor or oversee may be, suits against public companies (which virtually always have Section 102(b)(7) provisions) sounding in oversight liability will be dismissible if they fail to allege bad faith—i.e., a knowing breach of duty."); see also Caremark, 698 A.2d at 967 (duty of oversight cases "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.").

Accordingly, no matter how the relevant duty is defined, Oswald must plausibly allege that Ousley, Humphreys, and Kremen terminated the investigation in bad faith. See also Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1246 (Del. 1999) ("The presumptive validity of a business judgment is rebutted in those rare cases where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'"). It is bad faith "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or

10

where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." In re Walt Disney Co. Derivative Litig., 906 A.2d at 67. The SAC fails to adequately allege bad faith as to any of the three remaining defendants.

### 2. Individual Defendants

The SAC alleges that the Special Committee investigation was a "sham," and that its termination was premature, see SAC ¶¶ 114, 115, largely because—despite independent counsel noting "possible additional investigative work on certain items," and BDO requesting additional investigation to determine "whether it is likely that an illegal act has occurred"—the Special Committee recommended, and the Board voted for, its conclusion, see id.¶¶ 71, 78.

Disregarding conclusory allegations and looking solely at the SAC, however, it appears that the Special Committee's process was lengthy, its findings were detailed, and it resulted in real remedial action—even though it fell short of what Oswald and the outside advisors preferred. The investigation lasted approximately four months. Id. ¶¶ 53, 70. The committee had access to all of Identiv's "books, records, facilities, and personnel." Id. ¶ 53. It had the authority to retain outside advisors at Company expense without seeking board approval, and in fact retained independent counsel and Deloitte to assist with the investigation. Id. ¶¶ 53, 56, 59, 71. The Special Committee incurred "[a]pproximately $2.9 million in legal and professional fees" in connection with its investigation, although it was investigating $518,601.36 in "non-business personal expenses, expenses that violated Company policy and could not be supported as business expenses, or possible business expenses that were incurred in violation of Company policy." Demand Futility Order at 6; SAC ¶ 62. When presenting its findings to the Board, the Special Committee reported that: Hart had received reimbursements for certain expenses that were "personal in nature or inappropriate Company-related entertainment," certain expenses "violated the Company's Code of Conduct and Ethics and were inconsistent with [Hart's] employment

11

agreement," and the Board should "review enhancements to Company policies regarding reimbursement"; the "Company's policies, accounting systems and controls" relating to Hart's expenses were "not adequate," and as a result, the "all other compensation" reported for Hart in 2013 and 2014 may be understated; Hart's "entertainment of a U.S. government employee in 2014" and related expenses for the July 2014 trip "violated the Company's Code of Conduct and Ethics" and "should not have been reimbursed," and the Company should "adopt enhancements to its policies" relating to interactions with government officials; Hart was reimbursed for purchases from a vendor he knew personally, which might not have been arms-length; the October 2014 bonuses to Hart and Nelson had been questioned, and Identiv's finance group should "review the accrual" and make any necessary adjustments; Hart and Nelson should have brought allegations of wrongdoing that they learned about in March 2015, which were without merit, to the attention of others at Identiv; Hart "should have been more sensitive to the potential conflicts of interest" in engaging his sister and girlfriend as contractors, and the Company should "consult with counsel" about enhancements to its anti-nepotism policy; and a new CEO should be brought in. SAC ¶ 70.

The Special Committee reported that it had not found evidence that Hart "had knowingly misstated or falsified expense reimbursements requests," and it "expressed the view that [Nelson] should be retained but 'he should have been more attentive to certain Company policies in some instances.'" Id. ¶ 71. It "noted input from independent counsel" regarding "possible additional investigative work on certain items," but "stated that, in [its] view, the investigative phase had concluded." Id. "Ousley and Wenzel stated their view that the investigation had been very extensive and thorough, and that they now had sufficient information to conclude the investigative phase and focus on the remediation moving forward." Id. The Board unanimously accepted the Special Committee's recommendation to terminate the investigation. Id. Following the investigation, Identiv adjusted Hart's compensation by $13,147 for 2013 and $97,868 for 2014 because "previously reimbursed expenses . . . were not consistent with the Company's expense

12

guidelines and policies or because insufficient documentation was provided to support such expense reimbursements." Id. ¶ 81. Hart also repaid $35,784 of previously reimbursed expenses. Id. ¶ 89. Humphreys became CEO, and the Board entered into a new employment agreement with Hart. Id. ¶¶ 72, 73. Nelson was removed as CFO. Id. ¶ 77.

### a. Ousley

Of the three remaining defendants, the breach of fiduciary duty claim is weakest as to Ousley, who was a member of the Special Committee. See Demand Futility Order at 4. Ousley did not attend either of the Las Vegas parties, SAC ¶ 6, is not alleged to have submitted any improper expenses, id. ¶¶ 44–50, is not alleged to have benefitted from any improper reimbursements, does not appear to have been mentioned in the Ruggiero complaint, id., and is not even alleged to have been conflicted in his service on the Special Committee, id. ¶ 103. It simply cannot be bad faith for an independent director serving on a Special Committee to recommend the termination of what appears to be a thorough investigation. Indeed, the court in In re Computer Sciences Corp. Derivative Litigation, 244 F.R.D. 580, 591 (C.D. Cal. 2007), explained in the demand futility context that "directors [are] entitled to a presumption that they can and should be allowed to manage the business affairs of a corporation, including the decision of whether and how to investigate errors." Admittedly, this Court cited the In re Computer Sciences Corp. Derivative Litigation case in its Demand Futility Order, adding that "this presumption is rebutted if plaintiff pleads 'particularized allegations showing the Board is unworthy of this deference.'" Demand Futility Order at 23–24. The order held that the handling of Hart's problematic expenses, and "the inference that the Board knowingly chose not to investigate whether a crime had been committed" in connection with a U.S. Marshal's participation in one of the Las Vegas trips, raised a reasonable doubt that the Board's decision was worthy of deference. Id. at 24. Again, while the allegations might have been enough for demand futility, they do not plausibly allege bad faith.

13

As to expenses, the Special Committee did take substantial steps to "get to the bottom of its executives' expenses" by retaining Deloitte, who examined (and created a nearly 200 page spreadsheet about) thousands of expenses, and by discussing its conclusions with the Board. See Demand Futility Order at 24; SAC ¶¶ 56–62, 70. What Oswald objects to is the decision not "to allow further investigation." See Opp'n at 12. But an independent board member should be able to recommend the termination of an investigation, even if another member of the committee, or outside counsel, or a company's auditor, makes a contrary recommendation. See Charal Inv. Co., Inc. v. Rockefeller, No. 14397, 1995 WL 684869, at *3 (Del. Ch. Nov. 7, 1995) ("[r]easonable minds may differ as to what a thorough investigation may involve."); Halpert Enters., Inc. v. Harrison, No. 06-Civ-2331(HB), 2007 WL 486561, at *6 (S.D.N.Y. Feb. 14, 2007) ("'in any investigation, the choice of people to interview or documents to review is one on which reasonable minds may differ'") (quoting Mount Moriah Cemetery v. Moritz, No. 11431, 1991 WL 50149, at *4 (Del. Ch. April 4, 1991)); cf. Zucker v. Andreessen, No. 6014-VCP, 2012 WL 2366448, at *11 (Del. Ch. June 21, 2012) (recognizing "this Court's traditional reluctance to engage in establishing new standards of liability in corporate governance by judicial fiat."). If the law were otherwise, then no committee or board member could ever recommend terminating an investigation any time the decision to do so was not unanimous, or else he would open himself up to liability.

Nor is the rejection of independent counsel's suggestion of "possible additional investigative work" clearly bad faith, as the "cost of the investigation to that point dwarfed the total amounts that were flagged as potentially improper or that would be recovered." See OHK MTD at 7; cf. Postorivo v. AG Paintball Holdings, Inc., Nos. 2991-VCP, 3111-VCP, 2008 WL 553205, at *4 (Del. Ch. Feb. 29, 2008) (directors have "business acumen" to evaluate value; "[i]t is within the bounds of business judgment to conclude that a lawsuit, even if legitimate, would be excessively costly to the corporation"). Oswald argues that "[i]n response to BDO's identification of [the investigation's] deficiencies[,] Ousley did nothing to rectify them." Opp'n at 12. But Oswald cites to no authority

14

1  requiring Ousley to substitute BDO's judgment for his own. The decision to terminate the
2  investigation rather than continue investigating is simply not akin to the "intentional
3  violation of [a] . . . stock option plan, coupled with fraudulent disclosures regarding the
4  directors' purported compliance with that plan" at issue in Ryan v. Gifford, 918 A.2d 341,
5  357–58 (Del. Ch. 2007). It is a debatable business decision, which the Court will not
6  second-guess. See Corwin v. KKR Fin. Holdings LLC, 125 A.3d 304 (Del. 2015) ("judges
7  are poorly positioned to evaluate the wisdom of business decisions and there is little utility
8  to having them second-guess the determination of impartial decision-makers with more
9  information.").

10  As to the failure to investigate whether a crime had been committed, Oswald finds
11  fault with "Ousley proclaim[ing] that the Special Committee found no 'intentionally illegal
12  acts' when he knew full well that his committee had received no advice on the issue."
13  Opp'n at 13. But the Special Committee did examine Hart's 2014 entertainment of the
14  government employee, find that it violated Identiv's Code of Conduct and Ethics and
15  should not have been reimbursed, and recommend that Identiv, "with input from counsel,"
16  revise its policies on interactions with government officials. See SAC ¶ 70. The Special
17  Committee did tell BDO that it had not found "any intentional illegal acts," but it did not
18  conceal that "the Independent Counsel had not provided advice on that issue." See id. ¶
19  78. Oswald fails to cite to any authority requiring a board or special committee to
20  investigate whether any illegal act occurred, and indeed, one can imagine valid business
21  reasons for a board's decision not to do so. Cf. Gall v. Exxon Corp., 418 F. Supp. 508,
22  518 (S.D.N.Y. 1976) ("The decision not to bring suit with regard to past conduct which
23  may have been illegal is not itself a violation of law . . . Rather, it is a decision by the
24  directors of the corporation that pursuit of a cause of action based on acts already
25  consummated is not in the best interest of the corporation. . . . Such a determination, like
26  any other business decision, must be made by corporate directors in the exercise of their
27  business judgment."); In re Teledyne Def. Contracting Derivative Litig., 849 F. Supp.
28  1369, 1382 (C.D. Cal. 1993) ("Directors and officers simply need not confess guilt to

15

involvement in criminal conduct and breaches of fiduciary duties of care when such charges have not yet been brought, let alone proven."). The decision not to consult outside counsel to determine whether an act already examined and found to be in violation of company policy also violated the law might rise to the level of gross negligence sufficient to overcome the business judgment rule, but the Court is not persuaded that it is bad faith under the law.

Given the apparent thoroughness of the Special Committee's work, its detailed findings, its recommendations and remediation, Oswald has not plausibly alleged that it was bad faith for Ousley to recommend the termination of the investigation. "[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." Lyondell Chem. Co. v. Ryan, 970 A.2d 235, 143 (Del. 2009); see also In re TIBCO Software Inc. S'holder Litig., No. CV 10319-CB, 2015 WL 6155894, at *21 (Del. Ch. Oct. 20, 2015) (recognizing "high bar to pleading bad faith.").

### b. Humphreys and Kremen

The alleged conduct of Humphreys and Kremen also does not rise to the level of bad faith. Humphreys and Kremen differ from Ousley because, rather than serve as members of the Special Committee, both defendants were board members who voted to terminate the investigation. See SAC ¶¶ 70, 71. In addition, Humphreys attended the second Las Vegas trip with Hart, submitted $818.99 in connection with that trip, and submitted unrelated expenses for a conference and some headphones. Id. ¶¶ 50, 61, 98. Kremen attended both Las Vegas trips with Hart, received $1,900 in massages paid for by Hart, and submitted an expense of $1,338.78 in connection with the second trip. Id. ¶¶ 48, 50, 57, 58, 60, 61, 101.

These additional allegations do not tip the balance. Under the circumstances described above, Oswald has not plausibly alleged that it was bad faith for Humphreys or Kremen to accept the recommendation of the independent Special Committee that the

16

Board "conclude the investigative phase and focus on the remediation moving forward." See SAC ¶ 71. It is not a reasonable inference that the expenses Humphreys or Kremen incurred were material to them such that they caused defendants to "intentionally act[] with a purpose other than that of advancing the best interests of the corporation." See In re Walt Disney Co. Derivative Litig., 906 A.2d at 67. The Court has already held as much. See Demand Futility Order at 17 ("Oswald has not pled with particularity that these benefits (Kremen's $1,900 in massages and Humphreys' nearly $1,000 in reimbursed expenses) were material."). Nor is it reasonable to infer that Humphreys or Kremen improperly voted to conclude an investigation into their own misconduct, SAC ¶¶ 99, 102, because Deloitte had already reviewed the expenses connected with the Las Vegas trip in the course of the Special Committee investigation, see SAC ¶¶ 57–62, 98, 101, 102.

As with Ousley, given the apparent thoroughness of the Special Committee's work, its detailed findings, its recommendations and remediation, Oswald has not plausibly alleged that it was bad faith for Humphreys and Kremen to accept the independent Special Committee's recommendation and vote to terminate the investigation.

### 3. Conclusion as to the Breach of Fiduciary Duty Claim

While Oswald might have satisfied the second prong of Aronson in raising "a reasonable doubt" that "the challenged transaction was otherwise a valid exercise of business judgment," see Aronson, 473 A.2d at 814; Demand Futility Order at 20, he has failed to plausibly allege that Ousley's recommendation, and Humphreys and Kremen's votes, to terminate the Special Committee's investigation were made in bad faith. Accordingly, he has failed to state a claim for breach of fiduciary duty. See McPadden, 964 A.2d at 1274–75 (excusing demand under Aronson prong 2 but holding that while directors' actions were "either recklessly indifferent or unreasonable," plaintiff did not sufficiently allege bad faith on motion to dismiss).

//

//

17

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS all three motions to dismiss.

**IT IS SO ORDERED.**

Dated: April 13, 2018



_____
CHARLES R. BREYER
United States District Judge